**UNITED STATES, Appellee,**
v.
**Gene Earl EVANS, Appellant.**

**UNITED STATES, Appellee,**
v.
**Carl David EVANS, Appellant.**
**Nos. 71–1275, 71–1276.**

United States Court of Appeals,
Eighth Circuit.

Jan. 13, 1972.

Rehearing and Rehearing En Banc
Denied Feb. 11, 1972.

814

William I. Rutherford, St. Louis, Mo., for Gene Earl Evans.

Irvin Dagen, St. Louis, Mo., for Carl David Evans.

William C. Martin, Asst. U. S. Atty., Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., for appellee.

Before MATTHES and LAY, Circuit Judges, and HUNTER, District Judge.

ELMO B. HUNTER, District Judge.

On this appeal by appellants, Gene Earl Evans and Carl David Evans, from their conviction and sentence in the United States District Court for the Eastern District of Missouri for post office burglary, two primary questions are presented for our review. One is whether the trial court erred in not suppressing the testimony of certain witnesses and items under the "fruit of the poison

tree" doctrine. The other concerns whether the trial court erred in not providing appellants with certain presentence and psychiatric information and reports. The pertinent facts will be discussed in connection with each contention.

On the night of February 8, 1971, the United States Post Office in Middletown, Missouri, was broken into and burglarized. On February 10, 1971, at 2 o'clock in the morning Jessie Darrell Chandler was driving his 1962 Ford automobile on Highway 61 in Middletown, a small Missouri town, having a population of approximately 211 persons. Appellants and their father, Homer Evans, were passengers in the car. All of them lived in St. Louis, Missouri.

Gary McCaw, a police officer of Middletown, from his patrol car on a parking lot, noticed the Chandler car with one taillight inoperative cruising through the town. He saw it make an illegal "U" turn, and pursued and stopped it. Chandler got out and walked toward the patrol car where he was met by Officer McCaw who ascertained that Chandler had no driver's license. McCaw also ascertained from the others in the car that they had no drivers' licenses or other means of identification. Officer McCaw had previous information there had been several "break-ins" recently in the area. He asked Chandler if he could have permission to look through his car. Chandler said, "Yes".[1] Chandler also gave permission to McCaw to look in the trunk and opened it for him.

While standing on the ground outside the car, Officer McCaw glanced into the car, saw a brown paper sack on the back floor board, and saw a ski mask and some old clothes in it. While McCaw was looking at the sack one of the appellants tipped the sack toward him.

Officer McCaw then took Chandler back to his patrol car and there placed him under arrest for driving without a driver's license. He returned to the Chandler car, asked the three passengers to get out and searched them for weapons. He returned to the patrol car, searched Chandler and handcuffed him. He then obtained Chandler's permission for a young boy, who had been riding with Officer McCaw that evening, to drive the Chandler car a short distance to Main Street and park it off the road. This was done, and at the Main Street location appellants walked up to McCaw and asked if they could come over and get Chandler in the morning. McCaw arrested them for investigation.[2]

At 3:30 a. m. on February 10, 1971, Officer McCaw and two other officers returned to Middletown to search the car still parked on Main Street, and found burglar tools taped under the car hood. The burglar tools were left where seen. Later, at approximately 9:00 a. m. in Montgomery City Chandler was contacted, again given a *Miranda* type warning, and asked for permission to search the car. Chandler knew the burglar tools were hidden in the car but did not know they had already been discovered by the authorities. He again gave permission to search the car. The officers returned to the automobile and took possession of the burglar tools.

Later during the day of February 10, 1971, Chandler was interrogated. The interrogation included questions about

---

1. Chandler testified: "He (McCaw) asked for my driver's license and he advised me of my rights and everything and then he asked me if he could search my car, which I told him yes. Q. Now, sir, at that time tell us whether or not you knew that you didn't have to give your consent for Officer McCaw to search your car? A. I knew I didn't have to. * * * Did you know whether or not there were any burglar tools in the car at that time? A. Yes. Q. Did you know where they were in the car? A. Yes."

2. "Only reason I arrested them because I didn't know who they was, couldn't produce any identification, only thing I had was their word who it was, and because prior to that we had several break-ins."

the burglar tools.[3]  He gave a limited written statement tending to exonerate himself, but implicating appellants to some extent in the Middletown post office burglary.  On February 11, 1971, he was not interrogated.  On February 12, 1971, he was again interrogated, including questions about the burglar tools, and gave an additional written statement implicating both himself and appellants in the burglary.[4]  On March 5, 1971, and while represented by counsel, he entered a plea of guilty to the post office burglary charge.  A presentence investigation and report was ordered.  On March 22, 1971, he was sentenced to a three months' study under 18 U.S.C. § 4208(b).  While undergoing that study, on May 3, 1971, he appeared as a witness for the Government in the joint trial of appellants.  He testified that he acted as the lookout for them and saw them burglarize the Middletown Post Office the night of February 8, 1971.  He described the mail sack full of loot which they took during the burglary.[5]  As a result of the trial, appellants were convicted and later received substantial sentences.

### The Fruit of the Poisoned Tree Contention

About March 18, 1971, appellants filed their separate motions to suppress, directed at the burglar tools and all evidence discovered as a result thereof.  On April 23, 1971, a full evidentiary hearing was held.  The trial judge, the Honorable William H. Webster, holding that appellants had the requisite standing, sustained their motions to suppress, ordering the suppression of the burglar tools as evidence, together with all other evidence produced as a result of their seizure.  Later, and before the trial, appellants moved and argued that Chandler's testimony and all information and leads obtained from him, including the burglary loot consisting of a mail bag and its contents were fruit of the poisoned tree and also should be suppressed.  It was their claim that Chandler was confronted with the result of a bad search and bad arrest and, hence, confessed and implicated them.

The trial court gave a hearing as to each objected to witness and his testimony prior to permitting that witness to testify as a part of the trial.  The first such witness was Shirley Webster, a waitress whose testimony in the evidentiary hearing and later at the trial was that appellants and Chandler were people she had waited on in the restaurant in Richmond, Missouri, on the morning of February 8, 1971.  Her name had been obtained by the authorities from Chandler probably on February 12, 1971.  Another witness was Elsie Baker, who with her husband operated a confectionery business in St. Louis.  Her name had been mentioned to the authorities by Chandler as his employer.  She testified that on the night of February 7, 1971, the appellants came into the store while Chandler was there and that Chandler left with them, saying he was going someplace with them.

---

3.  Chandler testified that he had been fully advised of his *Miranda* type rights and stated:

"Q.  Now, at the time that you told him about the events of the February 8th incident in Middletown, tell us whether or not you knew that you weren't compelled to answer his questions?

"A.  I knew that I wasn't "repelled" to.

"Q.  Did he make any promise to you?

"A.  He did not.

"Q.  Force you in any kind of way?

"A.  No, he didn't.

"Q.  Did you know that you didn't have to talk unless you had an attorney?

"A.  Yes, I did.

"Q.  But yet you went ahead and voluntarily talked?

"A.  Yes.

"Q.  Did you give him the names of persons who might be witnesses in the case?

"A.  Yes, I did.

"Q.  Was that done freely and voluntarily?

"A.  Yes."

4.  In both of his written statements Chandler indicated a willingness to testify against appellants if requested to do so.

5.  This sack was marked as an exhibit but apparently was not offered in evidence.

In a series of rulings on the various motions Judge Webster held: (1) that the belated consent of Chandler to the search of the automobile that disclosed the burglar tools did not remove the illegality of that search; [6] (2) that all the items discovered during that search (burglar tools) were suppressed; and (3) that the live testimony of witnesses Chandler, Baker and Webster were not sufficiently closely tied to the illegal search to call for suppression. He ruled similarly as to the testimony concerning the mail bag and its contents.

### The Attenuation Concept

The Supreme Court in 1914 in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 held that evidence obtained in violation of the rights of a defendant under the fourth amendment is not admissible at trial. In Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) the Supreme Court further held that the prohibition also applied to other evidence derived through the evidence directly obtained by an illegal search or seizure. The Court went on to say that the facts thus obtained do not become "sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others." Id. at 392, 40 S.Ct. at 183. In Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), Mr.

Justice Frankfurter, writing for the court, further illuminated the boundaries of the exclusionary rule by declaring, "Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. *As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint."* (Emphasis added.) Thus, the Court articulated an alternative to proving an independent source, i. e., the Government might show sufficient attenuation of the causal connection to avoid the application of the exclusionary rule.

The attenuation concept, sometimes referred to as the nexus concept, was more fully developed and described in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[7] The defendant, Wong Sun, following an unlawful arrest on narcotic charges, was arraigned and released on his own recognizance. Several days later he voluntarily returned to the police station and made an unsigned self-incriminating statement. The Court in considering whether the statement was inadmissible as a result of the unlawful arrest first cited *Nardone, supra,* and then declared, " * * * We hold that the connection between the arrest and the statement had become so attenuated as to dissipate the taint." [8]

6. See, Annotation, Lawfulness of Search of Vehicle following Arrest for Traffic Violation, 10 A.L.R.3rd 314, et seq., and Annotation following Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

7. The Supreme Court reaffirmed the *Nardone* and *Wong Sun* doctrines in the following decisions: Costello v. United States, 365 U.S. 265, 280, 81 S.Ct. 534, 5 L.Ed.2d 551 (1960); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 273, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Alderman v. United States, 394 U.S. 165, 180–181, 89 S.Ct. 961, 22 L.Ed.2d 176 (1968); and Harrison v. United States, 392 U.S. 219, 230–231, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) with indications of a growing dis-

enchantment with the basic exclusionary rules—see Justice White's dissension in *Harrison, supra.*

8. In deciding that a statement made by Wong Sun's co-defendant Toy, made virtually simultaneously with an illegal arrest was rendered inadmissible as fruit of the poisonous tree, the Court said, loc. cit. 487–488, 83 S.Ct. loc. cit. 417: "This is not the case envisioned by this Court where the * * * Government learned of the evidence 'from an independent source' (citing *Silverthorne*); nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint' (citing *Nardone*). We need not hold that all evidence is 'fruit of the poisonous tree' simply because it

*Application of the Attenuation Doctrine*

Acknowledgeably not all courts have applied the exclusionary rule and its attenuation doctrine to "live testimony" in exactly the same manner. There are some in which live testimony has been suppressed as fruit of the poisonous tree [9] and others in which it has not.[10]

From our own examination of the cases it appears that those which apply the exclusionary doctrine so as to exclude live testimony in the main involve factual situations in which there was no source independent of the illegality and where the illegality directly led to the identity of the otherwise unknown witness without intervening factors of an attenuating character. For example, in United States v. Tane, 329 F.2d 848 (2 Cir. 1964), the illegal wire tap obtained from Tane without his knowledge or consent the name of a person who was used to testify against him.

By way of contrast, those cases which do not exclude the live testimony generally involve situations where the illegality did not directly result in learning the name of the informant used as a witness at the trial, or where there were substantial attenuating circumstances or an independent source. To illustrate, in United States v. Hoffman, 385 F.2d 501 (7 Cir. 1967), defendants Hoffman and Fears were involved in a conspiracy to transport counterfeit money interstate. Hoffman claimed the testimony of Fears and another witness disclosed by Fears

were inadmissible fruits of an illegal arrest. In rejecting this contention, the Court declared, "The testimony of Fears and Moses (witness disclosed by Fears) did not come about by government exploitation of the illegal arrest or of anything incidental thereto. The source of the testimony lies in two much later events the occurrence of which were wholly independent of any fruit of the arrest. First, Fears' decision to plead guilty, and second Fears' subsequent determination to testify as a Government witness."

■ Thus, each case must be examined on an ad hoc basis and must be ruled on its own facts rather than on any sweeping general concept of "live testimony" as such. In using the ad hoc approach, we are persuaded by the facts before us that the trial court did not err in permitting the testimony of Chandler, Baker and Webster. Chandler, the owner-driver of the searched car was lawfully stopped at 2:00 a. m. in a small town and arrested for certain violations of motor vehicle laws under circumstances where the arresting officer knew of several recent break-ins. His name and identity were properly acquired by the arresting officer and not by use of any illegal means. There is no contention that the officer acted in bad faith in the arrest or in the search that followed. It is undisputed that Chandler was given a *Miranda* type warning and that he elected to give statements which he has never asserted were other than voluntarily

would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

9. See: United States v. Alston, 311 F. Supp. 296 (D.C.1970); United States v. Schipani, 289 F.Supp. 43 (D.C.N.Y. 1968); Goodman v. United States, 285 F.Supp. 245 (D.C.Cal.1968); Smith v. United States, 120 U.S.App.D.C. 160, 344 F.2d 545 (1965); Williams v. United States, 382 F.2d 48 (5 Cir. 1967).

10. United States v. Hoffman, 385 F.2d 501 (7 Cir. 1967); Rogers v. United States, 330 F.2d 535 (5 Cir. 1964); United States v. Nagelberg, 434 F.2d 585 (2nd Cir. 1970); United States v. McGavic, 337 F.2d 317, 319 (6 Cir. 1964); Brown v. United States, 126 U.S.App.D.C. 134, 375 F.2d 310 (1966); Edwards v. United States, 117 U.S.App.D.C. 383, 330 F.2d 849 (1964); Smith v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963); Smith and Bowden v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963); United States v. Holsey, 437 F.2d 250 (10 Cir. 1970); 15 U.C.L.A. Law Rev. 32, 44 (1967); 115 U. of Pa.Law Rev. 1136, 1143-1153 (1967).

given even though his interrogations included questions about the illegally discovered burglar tools. He has never claimed any constitutional right of his was violated, and, after having counsel, elected for reasons personal to him first, to plead guilty and, later, to be a witness against appellants in their trial. We are convinced that the alleged causal connection between the illegal search and the live testimony of Chandler is not sufficient to require the application of the exclusionary rule. As a matter of common sense any connection that may have arisen from the illegal search and resultant discovery of the burglary tools to the later events that resulted in Chandler testifying against appellants at their trial had become so attenuated as to dispel any original taint that might otherwise be sufficient to require application of the exclusionary doctrine.

■ As to the names of the other two witnesses obtained from Chandler in his initial interrogations, it is clear from the uncontroverted facts that those names eventually and at a later time would have been revealed to the Government such as in the plea-taking process where Chandler plead guilty[11] or in connection with the Government's trial preparation, for Chandler on those occasions obviously was fully cooperative with the Government and a willing witness as to all that occurred in the post office burglary. By those times the attenuation doctrine had removed any objection which might otherwise exist as to any information Chandler might elect to give to the authorities. The same reasoning applies to the discovery of the mail bag and its contents. Chandler was free to testify on that subject at the trial and to tell about it at the time he plead guilty. The fact that he chose to

do so earlier as well as at the trial does not require application of the exclusionary rule either to exclude testimony concerning it or to its display at the trial. Any other result would be in defiance of common sense and would not be required to effectuate the basic purpose for which the exclusionary rule was originally established by judicial decision.[12]

### The Production of Reports Contention

The remaining contention we consider concerns whether the trial court erred in not requiring the Government to provide appellants' counsel with the presentence report of Chandler and with other information or reports concerning Chandler's mental condition.

On March 5, 1971, when Chandler entered his plea of guilty in his post office burglary case a presentence report to be prepared by the probation service of the court was ordered by Judge Wangelin before whom that case was pending. Under date of March 18, 1971, that presentence report was completed and available for Judge Wangelin's use at the sentencing of Chandler on March 22, 1971. On that date Judge Wangelin under authority of 18 U.S.C. § 4208(b) directed a 90-day study and report of Chandler. This latter report had not been completed by appellants' trial date of May 3, 1971.

On April 29, 1971, appellants' counsel moved for the production of the presentence report of March 18, 1971, and any accompanying material from the probation officer. Judge Webster, who first reviewed the report in camera, refused the request to produce on the basis it was provided for court use only and that Chandler had not consented to its production.[13] Appellants suggest this

---

11. Chandler plead guilty on March 5, 1971, and was sentenced on June 25, 1971.

12. See *Nardone* and *Wong Sun* cases, *supra*, and the cases cited in footnote 10, page 818.

13. We have reviewed this report in camera, and it is the typical presentence report

concerning a poorly educated person of less than average competence. Based on our examination of that report, we are of the firm opinion that the trial judge did not abuse any discretion he may have possessed in refusing to make the report available to appellants' counsel.

data would reveal Chandler was an alcoholic and perhaps other useful information about him and contend that it was error not to give them this material, citing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and United States v. Moore, 439 F.2d 1107 (6th Cir. 1971).

█ Both the *Brady* and *Moore* cases concern prosecutorial suppression of evidence crucial to the defense of the accused. Neither case concerns pretrial discovery as such, and neither is support for appellants' contention. Appellants do not cite and we are not aware of any authority to the effect that an accused in a criminal case is entitled as of right to obtain an official presentence report concerning another person on the basis that the other person may be a witness against the accused in the trial of the accused. Such a claimed right is contrary to public interest as it would adversely affect the sentencing court's ability to have presented to it on a confidential basis data from sources independent of the subject as well as from the subject for use in the sentencing process and not otherwise to be publicized.[14] This is especially true where the person who is the subject of the presentence report has not consented to its being given to another person for the other person's use in a public trial. We hold the trial judge neither abused his discretion nor erred in refusing production to counsel for appellants of Chandler's pretrial report and its accompanying data.

We do not reach the question as to what effect Chandler's consent to pro-

duction would have in the event he had consented.

█ The 90-day § 4208(b) study of Chandler by the Bureau of Prisons, had not been completed by the trial date of May 3, 1971. While appellants surmise that some psychiatric examinations and evaluations of Chandler may have been made before May 3, 1971, in connection with that study, there is no showing to that effect. In any event, any such examination, or evaluation is not subject to a motion to produce filed by a stranger to that examination who wishes to use it or its supportive data in a public trial, all without the consent of the subject of that examination. As we stated in connection with our discussion of the pretrial report, the § 4208(b) study and report concerning Chandler was ordered under statutory authority *for the Court's use in the sentencing of Chandler*. We note that Chandler had neither been asked nor had he given consent to its production. Under such circumstances we deem it to be contrary to public interest for a third person to be entitled as a matter of right to have it or any of its preliminary data produced in connection with a public trial. Cf. Powers v. United States, 325 F.2d 666 (C.A. 1 1963). We do not reach the question of its availability had Chandler consented to its production.

With regard to the Marshall Hospital record and data it contained concerning Chandler and his mental condition,[15] all this was present at the trial and Chandler at that time gave his consent to counsel for appellants to examine it. This they did, and with the knowledge

---

14. Compare Rule 32(c) (2) Federal Rules of Criminal Procedure, * * * "The Court before imposing sentence *may* disclose to the *defendant or his counsel* all or part of the material contained in the report of the presentence investigation . . . ." (Italics supplied.) And see the following cases to the effect that the trial judge in the exercise of his discretion may deny even to the subject of the report, a pretrial report. United States v. Rubin, 5 Cir., 433 F.2d 442, certiorari denied, 401 U.S. 945, 91 S.Ct. 961, 28 L.

Ed.2d 228; United States v. Bakewell, 5 Cir., 430 F.2d 721, certiorari denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384; United States v. Gross, 8 Cir., 416 F.2d 1205, certiorari denied, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427.

15. Chandler had been hospitalized some years before the trial in Marshall State School and Hospital at Marshall, Missouri, where he had undergone psychiatric type examination and treatment and eventually had been discharged.

of its contents cross-examined Chandler concerning many aspects of his background, including his so-called mental problems. Earlier appellants' counsel voluntarily had been given all data identified as having been received on February 18, 1971, by a Government representative through a phone call with a Dr. Bradley of the Marshall Hospital. Thus, it is quite clear that appellants' counsel had received all Marshall Hospital records and Marshall Hospital data concerning Chandler that they had requested.

We have carefully reviewed the entire transcript as well as appellants' contentions of error. We are convinced that appellants had a fair trial and that appellants' contentions of error are not meritorious.

The judgment is affirmed.