**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lloyd Oren HOLSEY, Defendant-
Appellant.**

No. 245–70.

United States Court of Appeals,
Tenth Circuit.

Dec. 21, 1970.

Russell Cranmer, Wichita, Kan.
(Michaud & Cranmer, Wichita, Kan., on
the brief), for defendant-appellant.

John J. Immel, Asst. U. S. Atty. (Robert J. Roth, U. S. Atty., on the brief), for plaintiff-appellee.

Before PHILLIPS, BREITENSTEIN and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Holsey was charged by indictment with bank robbery and in the commission thereof with putting the life of Fred L. McMillen in jeopardy by the use of a dangerous weapon, in violation of 18 U.S.C. § 2113(a), (d).

He was convicted, sentenced, and appealed. This court reversed, on the ground that evidence was seized by an unlawful search and was improperly admitted. See United States v. Holsey, 10 Cir., 414 F.2d 458.

He was again tried, convicted, and sentenced, and has appealed.

About noon on July 5, 1967, a man entered the National Bank of Wichita, in Wichita, Kansas. He approached Frederick McMillen, a teller of the bank, pointed a pistol at him, handed him a brown paper bag, and said, "Fill this up. I mean business. Don't press any buttons." McMillen reached in his cashier's box, took money therefrom, and put it in the bag. Another teller, L. B. Warren, started to walk toward McMillen's window, and the robber said, "Don't move. Stay exactly where you are at." After receiving the money, the robber fled from the bank. Another teller, Donna Drouhard, from about six feet from McMillen's window, observed the robbery while it was in progress.

At a lineup held November 9, 1967, in the County Jail of Sedgwick County, Kansas, McMillen, Warren and Drouhard identified Holsey as the man who committed the robbery. Holsey contends that the officers conducting the lineup compelled Holsey to be a witness against himself.

The natural color of Holsey's hair was dark. Before his arrest, he had dyed his hair a light color, and it was a light color when the lineup was held. The jailer selected from available persons five who

best resembled Holsey, except that their hair was dark. The bank tellers had theretofore given a description of the robber and stated that his hair was dark.

Prior to the holding of the lineup, Agents of the F.B.I. attempted to persuade Holsey to restore the dark color of his hair. Holsey refused.[1] F.B.I. Agent Richard Eckberg supplied Holsey with a dark wig before the lineup was held, but Holsey refused to wear it. As a result, he was the only person in the lineup with light hair. Holsey also refused to put on articles of clothing furnished to him and the other five persons in the lineup. Holsey threw the clothing on the floor. The other five persons put it on. The officers asked the persons who were to appear in the lineup to wear dark glasses. All of them did so, except Holsey. He refused.

Two attorneys representing Holsey were present at the lineup.

The officers did everything possible to make the lineup fair. If Holsey suffered any disadvantage, it was because of what he, himself, did or refused to do. He apparently thought that perhaps the light color of his hair would be to his advantage. All he was compelled to do was to exhibit his person for observation in the lineup.

The following facts are pertinent, because of Holsey's claim that the testimony of witnesses introduced at the trial was discovered from information that was obtained by the Agents of the F.B.I. by the unlawful search and seizure, and was therefore tainted by such unlawful search and was improperly admitted.

On November 1, 1967, Holsey was arrested, and a search made of his rented house and his automobile. Those were the searches held illegal by this court on the former appeal.

On October 23, 1967, Paul Farmer, an employee of the Sheriff's office of Sedgwick County, Kansas, gave Eckberg information that he had obtained, indicating that Holsey was involved in the bank robbery. Farmer also told Eckberg that Holsey was driving a 1961 Thunderbird automobile, bearing Tennessee license number J1–3297, and that he believed it was a hardtop.

After receiving such information, Eckberg, on October 25, 1967, requested the F.B.I. in Nashville, Tennessee, to check such license number in the official records and determine in whose name the automobile, for which license number J1–3297 was issued, was registered.

On October 31, 1967, the Nashville F. B.I. conducted such investigation and learned that a 1961 Ford Thunderbird automobile bearing Vehicle Identification Number IY71Z162734 was registered in the name of Jack D. Weber, 1044 South Sedgwick, Wichita, Kansas, Tennessee license number J1–3297. Also, on October 31, 1967, the Nashville F.B.I. checked with the Title Section of the Motor Vehicle Division, Nashville, Tennessee, and learned that on August 16, 1967, a Ford Thunderbird two door hardtop, VIN IY71Z162734, was titled under Tennessee title number 12268693, and the records listed the owner as Jack D. Weber, 1044 South Sedgwick, Wichita, Kansas, and stated the vehicle was purchased by Weber on July 14, 1967, from "Doc" Jenkins Motors, 410 La-Fayette Street, Nashville, Tennessee, for $823. Such information led the F.B.I. to conduct a further investigation in the Nashville area. The information regarding the purchase of the Thunderbird from "Doc" Jenkins Motors led to the discovery by the F.B.I. of all the witnesses from Tennessee who testified at the second trial and what their testimony would be.

Walter W. Dunkling, an Agent of the F.B.I., stationed at Nashville, interviewed "Doc" Jenkins a few days after November 22, 1967. As a result of his interview with Jenkins, Dunkling located and interviewed Edward Collins and A. J. Tomlinson. Tomlinson told Dunkling he met a man by the name of Jack Web-

---

1. Before the trial, Holsey had let his hair resume its natural dark color.

er at the Hermitage Hotel in Nashville, Tennessee. Dunkling then interviewed Edward F. Hocker, a clerk of such hotel, and learned that Weber made several local telphone calls from the hotel. Dunkling then learned that one of such local calls was made to the residence of Rudy Ruark. He then proceeded to interview Ruark and also several other persons to whom local calls were made, but who did not testify as witnesses at the second trial.

A document was found in the search of Holsey's house on November 1, 1967, which evidenced the purchase of the Thunderbird from "Doc" Jenkins Motors by a person using the name Jack Weber and payment therefor by Weber of $823.85, but an F.B.I. Agent at Nashville, on October 31, 1967, had learned of the purchase of the Thunderbird from "Doc" Jenkins Motors on July 14, 1967, by a man giving his name as Weber, and the payment therefor of $823.

On October 28, 1967, Jerry Dietz, a highway patrolman, stopped Holsey (then using the name Jack Weber) and gave him a ticket for speeding and failure to register his vehicle in Kansas. Dietz testified at the trial and identified Holsey as the man he stopped on October 28, 1967. On October 31, 1967, Dietz heard a broadcast of a dispatch from the Highway Patrol dispatcher at Salina, Kansas, giving the name of the driver of an automobile as Lloyd O. Holsey, a description of the vehicle, and the license plate number. Dietz recognized it as a vehicle he had stopped on October 28, 1967, and he notified the dispatcher that he thought he should notify the F. B.I. Such notification to the Wichita F.B.I. led to Holsey's arrest on November 1, 1967.

The document and other material found in the search of Holsey's house gave the F.B.I. no new information. They already knew from the investigation of October 31, 1967, that a person using the name of Jack Weber had purchased the Thunderbird and they had information on October 31, 1967, that Holsey and Weber were the same person.

They also knew prior to October 31, 1967, that Holsey was driving a Thunderbird which answered the description of the one registered by Weber in Tennessee and had the same license plate.

Jenkins testified at the second trial and identified Holsey as the person who had purchased the Thunderbird from him under the name of Weber.

Tomlinson testified at the second trial that he was a cab driver in Nashville in 1967; that he met a person known as Jack Weber, who said he was from Wichita, Kansas; that he transported such person in his cab several times. He identified Holsey as the man he knew as Jack Weber. He further testified that he drove such person to "Doc" Jenkins Motors, where such person purchased a 1961 Thunderbird; that there was a leak in the power steering of the Thunderbird, which had to be repaired, and that he drove such person back to the Hermitage Hotel.

Ruark testified at the second trial that he advertised a 1965 sports model Chevrolet for sale; that a person giving his name as Jack Weber answered the advertisement by telephone; that he arranged to meet such person at the Hermitage Hotel, and that the person stated he would be standing in front of the Hermitage Hotel; that he went to the hotel and picked up a person, who introduced himself as Jack Weber, and that they failed to make a deal. Ruark pointed Holsey out in the courtroom as the person who had introduced himself to him as Jack Weber.

I. Did the conducting of the lineup compel Holsey to be a witness against himself?

■ In United States v. Wade, 388 U.S. 218, at 222, 87 S.Ct. 1926, at 1930, 18 L.Ed.2d 1149, the court said:

"We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit

his physical characteristics, not compulsion to disclose any knowledge he might have. * * *"

The court cited with approval a statement to the same effect in Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 54 L.Ed. 1021.

While prior to the trial Holsey was compelled to exhibit his person for observation in the lineup, he was in no way compelled to give any "evidence having testimonial significance." He was compelled to exhibit his "physical characteristics," but he was not compelled "to disclose any knowledge he might have." If Holsey suffered any disadvantage in the lineup, it was due entirely to his actions and inactions. The jailer and the F.B.I. endeavored to make the lineup fair and impartial and free from any prejudice to Holsey, who refused to cooperate to that end.

On the first appeal, the court reviewed what occurred at the lineup and identification and concluded that the requirements laid down in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, were met, and that there was no violation of Holsey's constitutional privilege against self-incrimination. We reaffirm that holding.

II. Was evidence introduced at the trial tainted by the unlawful search?

 With respect to the contention that testimony was discovered and introduced at the trial by the use of information obtained by the F.B.I. Agents through the unlawful search, the record speaks for itself and refutes the claim.

The information, which led to the discovery of the witnesses from Nashville, Tennessee, who testified at the second trial and the pertinent facts that they knew and to which they would testify, was known to the F.B.I. Agents on or prior to October 31, 1967, and before the search was made. Hence, they were within the exception to the exclusionary prohibition laid down in Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441, and recognized in the following language in the opinion, which it quoted with approval from Silverthorne Lumber Co. v. United States, 251 U.S. 385, at 392, 40 S.Ct. 182, at 183, 64 L.Ed. 319, as follows:

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed."

Here, such knowledge obtained by the search gave the F.B.I. Agents no information they did not have before, and in nowise tainted the evidence received at the second trial.

Accordingly, the judgment is affirmed.