**UNITED STATES of America, Plaintiff-Appellee,**

v.

**David MARDER, Defendant-Appellant.**

**No. 72–2390.**

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1973.

Max B. Kogen, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Robert B. Patterson, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GEWIN, SIMPSON and RONEY, Circuit Judges.

GEWIN, Circuit Judge:

David Marder appeals from his conviction for using a wire communication facility to transmit wagering information in interstate commerce while being engaged in the gambling business in violation of 18 U.S.C. § 1084.[1] He was convicted on September 30, 1971 on three

---

1. 18 U.S.C. § 1084(a) provides:
   Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

counts of violating the statute and sentenced to eight months imprisonment under each count and fined $5,000. The sentences under each count are to run concurrently. He presents two issues to this court for review. First, he alleges that the evidence was insufficient for his conviction. Secondly, he asserts that the testimony of certain government witnesses should have been excluded because the identity of these witnesses was obtained as a result of an illegal government wiretap.

Although we find merit in appellant's second contention, we conclude the failure of the trial court to exclude the testimony of certain witnesses, assuming arguendo that their identity was discovered by an illegal government wiretap, was harmless error beyond a reasonable doubt and therefore affirm. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ We summarize the relevant facts. Government agents, who were stationed at adjacent telephone booths, overheard Marder making calls from a pay telephone booth in the lobby of a Las Vegas, Nevada hotel to a telephone in Miami, Florida. There is no need to relate the specific content of these conversations since each fairly obviously involved wagering information relative to sporting events. There was sufficient evidence introduced by the government to prove that Marder committed the first element of the offense charged which forbids the use of a wire communication facility for the transmission in interstate commerce of wagering information. In addition the burden was on the government to establish that Marder was in the business of gambling or in common parlance, was a "bookie". See, Cohen v. United States, 378 F.2d 751 (9th Cir. 1967); Truchinski v. United States, 393 F.2d 627 (8th Cir. 1968). To prove this essential element of the

offense, the government relied on four major witnesses.

Mr. Jellison, a government agent who had appellant under surveillance, testified that he saw appellant discard a packet into a trash can about one block away from his home. This packet, and two others retrieved on two subsequent Mondays, after major weekend sporting events, contained torn up bits of paper. Each packet contained evidence which linked its contents directly to Marder.[2] Other government evidence introduced established that the writing on the papers contained within each packet was made by the same person and the terminology used was definitely that of a bookmaker.

The government introduced testimony of three other witnesses to establish that Marder was engaged in the business of betting or wagering. Each of these witnesses, Kasselman, Popper, and Greene, testified that they had made numerous bets and wagers with the appellant over an extended period of time.

Prior to trial, the appellant moved to suppress evidence obtained from a wiretap which had been placed on his phone in November and December of 1970, approximately 60 to 90 days after the telephone calls alleged in the indictment. His motion was denied on the assertion by the government that no evidence obtained from the wiretap would be used against the defendant. Consequently, the trial court did not rule on the propriety of the government wiretap or the nature or content of the evidence found by its use. It is against this confined background that we must confront appellant's contentions on appeal.

The government's first witness in their attempt to establish that Marder was engaged in the business of gambling was Benjamin Kasselman. Kasselman testified that he had several encounters with appellant in which he placed bets

---

2. The first packet contained a postcard addressed to Marder and his wife; the second, business envelopes used in Marder's dress shop; and the third, other correspondence addressed to Marder.

and made wagers. In response to a subsequent question on cross-examination inquiring whether he had told the grand jury about placing bets with appellant, Kasselman replied, "yes, sir, because I was informed that it was on the tapes, when I was calling Mr. Marder." When Kasselman responded that he had originally been approached by the government in January or February of 1971, counsel for Katz, a co-defendant who was also on trial with Marder but was acquitted, immediately requested a *voir dire* examination of him so he could determine whether the government had learned of his identity as a result of the wiretaps. The court denied counsel's request and stated:

> . . . You cannot, because if you do, you get a terrific fine from me, because you are abusing the province of the law. . . . I am awfully tired of people not trying a law suit according to the rules. . . . We all know wiretapping is going on. Do not bring it into this case.

We have no way of knowing with certainty the basis of the trial court's ruling in denying counsel's requested *voir dire* examination. The court may have determined that its original denial of the motion to suppress was conclusive on this issue, continuing to rely on government assurances that no evidence elicited from the wiretaps were being used. However, the lower court may have erroneously concluded that the identification of key government witnesses from wiretaps, even if they were illegal, was not fruit of the poisonous tree.

Since the trial court never ascertained the propriety of the government wiretapping, we approach the issue presented here under the assumption that such intrusions were illegal. Conceding an illegal search, the issue presented to this court is whether a witness who could not have been located but for the illegal search, must not be permitted to testify because he is also the fruit of the poisonous tree.

■ This circuit has followed the general rule that if the identity of a government witness and his relationship to the defendant are revealed because of an illegal search and seizure, the testimony of such witness must be excluded. Williams v. United States, 382 F.2d 48 (5th Cir. 1967).[3] In Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S. Ct. 182, 64 L.Ed. 319 (1920), Justice Holmes reiterated the general exclusionary rule:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court *but that it shall not be used at all*. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

*Id.* at 392, 40 S.Ct. at 183 (Emphasis added). This rather extensive explanation of the exclusionary rule has been qualified somewhat by the "attenuation rule." In Wong Sun v. United States, Justice Brennen explicated this recognized qualification when he stated:

> . . . not . . . all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Therefore, once

---

3. Accord, United States v. Tane, 329 F.2d 848 (2d Cir. 1964); Smith v. United States, 120 U.S.App.D.C. 160, 344 F.2d 545 (1965); Goodman v. United States, 285 F.Supp. 245 (D.C.Cal.1968).

it is demonstrated that the identity of a key government witness was discovered by an illegal search and seizure, his testimony must be excluded unless the government can show: (1) the identity of the witness originated from an independent source; see, United States v. Holsey, 437 F.2d 250, 253 (10th Cir. 1970); (2) the identity of the witness discovered from the original illegal seizure has become so attenuated as to remove the original taint.

We do not adopt a per se rule which would *ipso facto* preclude the utilization of all testimony of a witness identified as a consequence of an illegal search. Many extenuating circumstances may affect the appropriateness of the introduction of such testimony, which would not pertain to an inanimate object seized by an illegal search.

■ However, the same basic rule of exclusion follows from an illegal search, whether the evidence be animate or inanimate, tangible or intangible. Rogers v. United States, 330 F.2d 535, 540–541 (5th Cir. 1964). Any other conclusion would be totally inconsistent with the fundamental purpose of the exclusionary rule; to instill respect in government officers for a citizen's fourth amendment rights.[4]

■■ Nevertheless, the type of evidence seized will undoubtedly determine the circumstances that must be considered in determining whether the original taint has been so attenuated, that its exclusion is no longer mandated. Several factors should be considered in deciding whether the attenuation rule is applicable to "live testimony." The unpredictability of the human will, which is necessarily involved in the use of a witness to prove essential elements of a crime,

forecloses the adoption of any rigid rules. "Thus, each case must be examined on an ad hoc basis, considering the particular facts presented, rather than on any sweeping general concept of 'live testimony' as such." See, United States v. Evans, 454 F.2d 813, 818 (8th Cir. 1972).

Proof that the witness would have come forward by his own volition, regardless of his identification by the illegal search, would be extremely relevant to a determination of attenuation. United States v. Hoffman, 385 F.2d 501, 504 (7th Cir. 1967). Likewise, evidence that the witness was completely uncooperative when originally discovered by the illegal search but later changed his attitude and supplied the necessary information, would tend to prove the attenuation of the original taint. See, Smith & Bowden v. United States, 324 F.2d 879, 882, 117 U.S.App.D.C. 1 (1963). This, is certainly not an exhaustive list of the factors to be considered. Only reasoned judgment will determine whether the necessary circumstances exist which call for the application of the attenuation rule to so called "live testimony."

This explication is in complete conformity with the general rule adopted by this court in Williams v. United States, 382 F.2d 48 (5th Cir., 1967). In *Williams* we found that a close nexus existed between the illegal seizure of the inanimate evidence and the identification of the key government witness. We concluded that "but for" the illegal seizure, the government would have never discovered the relationship of the witness to Williams.[5] This was true even though the witness never identified the defendant until two years after the original il-

---

4. For an excellent discussion of the attenuation rule and its application to "live testimony", see, Ruffin, Out on a Limb of the Poisonous Tree: The Tainted Witness, 15 U.C.L.A. 32, 44 (1967).

5. The *"but for"* test is not to be applied in a ritualistic fashion. Subsequent in-

tervening forces may break the casual connection between the alleged primary illegality and the evidence found. See, United States v. Fike, 449 F.2d 191, 193 (5th Cir. 1971); Nardone v. United States, 308 U.S. 338, 441, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

legal seizure. We stated the general rule to be:

> . . . the significance of the nexus between an illegal search and challenged evidence is one of common sense, see Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), to be considered under the facts and circumstances of the particular case. Suffice it to say that the road from the illegal search to the testimony of Mrs. Thomas, (the government witness) although a little long, was not a winding one. United States v. Tane, 329 F.2d 848 (2d Cir. 1964). 382 F.2d at 51.

Our decision today, does no more than refine our original pronouncement in *Williams*.

Although the district court should have permitted appellant to conduct a *voir dire* examination of Kasselman who testified that he had made bets with appellant, we find such failure harmless error. After a careful review of the record, we conclude there were only two possible witnesses, Kasselman and Greene, whose identities could have conceivably been discovered by the illegal wiretap.[6] Nothing in the record reveals how the government happened to discover the identity of these witnesses and their relationship to appellant.

However, agent Jellison testified that he saw Popper and Marder together on September 8, 1970. This clearly establishes that the government learned of Popper's identity over two months before the allegedly illegal wiretaps. Therefore the evidence clearly shows that Popper's testimony that he had extensive dealings with appellant was untainted.

 We conclude that evidence of the packets discarded by Marder and the testimony of Popper clearly established that appellant was in the business of gambling. The case against Marder was irrefragable. There was more than ample evidence that he committed the substantive offenses charged. The admission of the testimony of Kasselman and Greene, could have had only a de minimis bearing on the question of guilt or innocence when viewed in light of the overwhelming evidence of guilt from other sources.

For the foregoing reasons the judgment of the district court is affirmed.

---

6. There was strong circumstantial evidence that Greene might have furnished needed evidence by his own volition. Counsel for Marder cross-examined Greene rather thoroughly as to the circumstances surrounding his contact with agent Jellison. Greene testified that he met his attorney at the office of agent Jellison and at that time gave a sworn unsigned statement and agreed to appear and testify for the government. This occurred several months prior to trial but presumptively after the wiretaps. We have no way of knowing with detailed certainty the nature of the government's activity in obtaining Greene's testimony. Such speculation is useless because of our disposition of this case.