**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Martin Willard HOULTIN and Kenneth**
**B. Phillips, Defendants-Appellants.**

No. 76–4107.

United States Court of Appeals,
Fifth Circuit.

Jan. 30, 1978.

Rehearing and Rehearing En Banc
Denied April 10, 1978.

Joseph S. Chagra, El Paso, Tex., for Houltin.

William M. Ravkind, Dallas, Tex., for Phillips.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Jeremiah Handy, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

This direct criminal appeal presents two issues. First, does the taint from illegal wiretaps extend to the evidence provided by the testimony of codefendants who, without standing to object to the wiretaps, were convicted as a result thereof and then testified under a grant of use immunity against defendants who did have standing? Second, does the Double Jeopardy Clause of the fifth amendment bar the retrial of defendants whose convictions were reversed because the evidence used to convict them resulted from illegal wiretaps?

On October 17, 1974, a jury convicted defendants Martin W. Houltin and Kenneth B. Phillips and codefendants Robert Burke, Duane Morrison, Michael Francis, and Kenneth J. Croucher on two counts of conspiring to import and possess 2,260 pounds of marijuana in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) and 21 U.S.C. § 841(a)(1). The trial judge sentenced each to consecutive five-year terms of imprisonment on each count and imposed varying fines. Defendants and codefendants appealed to this Court, which reversed the convictions of defendants Houltin and Phillips because the police, both federal and state, violated the fourth amendment by using illegal wiretaps during the investigation phase of the case.[1] We sustained the convictions of the four codefendants, however, because they lacked standing under the fourth amendment to challenge the illegal wiretaps. *See United States v. Houltin,* 5 Cir., 1976, 525 F.2d 943, *vacated in part sub nom., Croucher v. United States,* 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745, *modified,* 5 Cir., 1977, 553 F.2d 991.[2]

On remand, Houltin and Phillips waived a jury trial. The Government obtained an order from the district court granting use immunity to convicted codefendants Burke, Morrison, Francis, and Croucher. These codefendants did not actually take the witness stand, however, although they were present in the courtroom. Instead, by stipulation in the record and as a matter of convenience, it was agreed that if they formally testified, their testimony would be the same as that of the D.E.A. agents who had testified at the first trial, but who could not now testify because their knowledge resulted from the illegal wiretaps. Counsel for the Government and defendants also by agreement offered some additional testimony. The district court found Houltin and Phillips guilty and sentenced each to a ten-year term of imprisonment, a special parole term of five years, and a fine. This appeal followed.

## I. Fruit of the Poisonous Tree

Houltin and Phillips argue that the trial court erred in allowing the Government to use the testimony of the four codefendants who testified under a grant of use immunity. The evidence provided by such testimo-

---

1. The wiretaps were illegal because authorities failed to comply with 18 U.S.C. § 2516(2), which requires the "principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof" to apply to a state court judge for an order authorizing a wiretap. In this case only an assistant district attorney signed the wiretap applications.

2. A more complete statement of the facts and circumstances surrounding the defendants' and codefendants' arrests and convictions are found in this opinion at 525 F.2d at 945–48.

ny, according to defendants, is "fruit of the poisonous tree," *see Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), because the Government first learned of the substance of codefendants' testimony as well as obtained their arrests and convictions from evidence discovered through the same illegal wiretaps that could not lawfully be used against Houltin and Phillips in the first trial. Defendants contend, in effect, that by forcing the codefendants to testify through a grant of use immunity the Government is able to circumvent the exclusionary rule and use indirectly against defendants evidence that could not be used against them directly. The Government, on the other hand, argues that the illegal wiretaps did not taint the evidence provided by the codefendants under the order compelling them to testify.

 The fourth amendment exclusionary rule was born as a matter of federal law in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and extended to state criminal trials in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).[3] Its purpose is not to redress the injury to the search and seizure victim's privacy; reparation comes too late for that. *See Linkletter v. Walker,* 381 U.S. 618, 637, 85 S.Ct. 1731, 1742, 14 L.Ed.2d 601 (1965). Rather, "the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra, supra,* 414 U.S. at 347, 94 S.Ct. at 619–20. *See* Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized,* 56 Calif. L.Rev. 579, 646 (1968). As Justice Stewart pointed out in *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960):

The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.

*Accord, Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).

 Under the exclusionary rule, evidence obtained in violation of the fourth amendment cannot be used in a criminal trial against the victim of the illegal search and seizure. The Constitution does not require this remedy; it is a doctrine of judicial design. Excluded evidence oftentimes is quite reliable and the "most probative information bearing on the guilt or innocence of the defendant." *Stone v. Powell, supra,* 428 U.S. at 490, 96 S.Ct. at 3050. Nonetheless, the rule's prohibition applies to such direct evidence as well as to "fruit of the poisonous tree"—secondary evidence derived from the illegally seized evidence itself. *Wong Sun v. United States, supra* ; *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). *See* 18 U.S.C. § 2518(10)(a) (authorizing the suppression of any unlawfully intercepted wire or oral communication and the evidence derived therefrom). However, as Justice Brennan observed in *Wong Sun,*

[w]e need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

---

**3.** The rule currently is steeped in considerable controversy and is being critically questioned by both courts and commentators. *See, e. g., Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Walder v. United*

*States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), *United States v. Cruz,* 5 Cir., 1977, 559 F.2d 300; Amsterdam, *Search, Seizure, and Section 2255: A Comment,* 112 U.Pa.L.Rev. 378 (1964); Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U.Chi.L.Rev. 665 (1970); McGarr, *The Exclusionary Rule: An Ill Conceived and Ineffective Remedy,* 52 J.Crim.L.C. & P.S. 266 (1961).

371 U.S. at 487–88, 83 S.Ct. at 417, *quoting* Maguire, *Evidence of Guilt* 221 (1959). Thus, once a defendant demonstrates that the Government discovered evidence through an illegal search and seizure, the court must exclude it unless the Government satisfies one of two exceptions:

> First, the connection between the lawless conduct of the police and the discovery of the challenged evidence may "become so attenuated as to dissipate the taint." *Nardone v. United States,* 1934, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307. *See Williams v. United States,* 5th Cir. 1967, 382 F.2d 48. . . .
>
> The second means for "purging the taint" is discovering the same evidence from an "independent source." *Silverthorne Lumber Co. v. United States,* 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319. *See, e. g., Agius v. United States,* 5th Cir. 1969, 413 F.2d 915.

*United States v. Castellana,* 5 Cir., 1974, 488 F.2d 65, 67, *rev'd on other grounds,* 5 Cir., 1974, 500 F.2d 325 (*en banc*). *See Wong Sun v. United States, supra,* 371 U.S. at 487, 83 S.Ct. at 417; Note, *Fruit of the Poisonous Tree—A Plea for Relevant Criteria,* 115 U.Pa.L.Rev. 1136, 1137–38 (1967).

■ The evidence which defendants contest in this case as fruit of the poisonous tree falls squarely within both of these exceptions. We reach this conclusion in part on the basis of the sound advice in *Williams v. United States,* 5 Cir., 1967, 382 F.2d 48, 51:

> [T]he significance of the nexus between an illegal search and challenged evidence is one of common sense, . . . to be considered under the facts and circumstances of the particular case.

*See Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *United States v. Evans,* 8 Cir., 454 F.2d 813, 818, *cert. denied,* 406 U.S. 969, 92 S.Ct. 2423, 32 L.Ed.2d 668 (1972). The facts and circumstances of this case indicate first that the evidence used to convict Houltin and Phillips came from a source independent of the illegal wiretaps. It is undisputed that the D.E.A. agents knew the identity of the four codefendants for several years before the illegal wiretaps.[4] The Government did not, however, at that time know all the details of defendants' and codefendants' smuggling operation. In the first trial, both probable cause to arrest and evidence to convict all of the conspirators came from the illegal wiretaps. This is not true with respect to the second trial of defendants Houltin and Phillips. In that proceeding the wiretaps played no part. There the overwhelming evidence of defendants' guilt was derived solely from their codefendants' stipulated testimony. This testimony came not from the wiretaps but from codefendants' own intimate knowledge of the marijuana smuggling operation in which they participated with defendants. That the Government knew first of the events and activities testified to as a result of the wiretaps is not decisive. The testimony constitutes an independent source. *See United States v. Marder,* 5 Cir., 1971, 474 F.2d 1192, 1196; *United States v. Holsey,* 10 Cir., 1970, 437 F.2d 250, 253.

■ We also find that the evidence derived from the four codefendants' testimony had " 'become so attenuated as to dissipate the taint' " of the illegal wiretaps. In *United States v. Marder, supra,* at 1196, this Court observed:

> [T]he type of evidence seized will undoubtedly determine the circumstances that must be considered in determining whether the original taint has been so attenuated, that its exclusion is no longer mandated. Several factors should be considered in deciding whether the attenuation rule is applicable to "live testimony." The unpredictability of the human

---

**4.** In defendants' first appeal we noted that "[f]or several years before their arrests, the defendants-appellants, Martin W. Houltin, Robert Burke, Duane Morrison, Michael Francis, Kenneth B. Phillips, and Kenneth J. Croucher, had been under extensive investigation for narcotics smuggling activities." *United States v. Houltin, supra,* 525 F.2d at 945. Their arrests were on October 12, 1973, and the illegal wiretaps were placed between September 27 and October 12, 1973. *Id.* at 947–48.

will, which is necessarily involved in the use of a witness to prove essential elements of a crime, forecloses the adoption of any rigid rules.

One such factor is proof that the witness has come forward "by his own volition, regardless of his identification by the illegal search." *Id., citing United States v. Hoffman*, 7 Cir., 1967, 385 F.2d 501, 504, *cert. denied*, 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968). Another is "evidence that the witness was completely uncooperative when originally discovered by the illegal search but later changed his attitude and supplied the necessary information." *Id., citing Smith v. United States*, 1963, 117 U.S.App.D.C. 1, 4, 324 F.2d 879, 882.

■ Both factors are present in this case. Defendants make much of the fact that the Government compelled codefendants' testimony by granting them use immunity. Houltin and Phillips assert that codefendants did not want to testify and did so only because their attorney advised them they had no other legal alternative. This, however, indicates only that their testimony was not volunteered; it does not necessarily render it involuntary. It is true that had the four codefendants refused to testify, they would have risked being cited for contempt. It also is possible that such refusal might have adversely affected their pending motions for reduction of sentence under Fed.R.Crim.P. 35. On the other hand, the codefendants could have reasoned that their truthful testimony might enhance the possibility that the court would grant their Rule 35 motions. In short, codefendants' choice may have been hard, but it was a choice nonetheless. One source of attenuation, then, is to be found in the exercise of the codefendants' own wills. *See Brown v. United States*, 1966, 126 U.S.App.D.C. 134, 139, 375 F.2d 310, 315, *cert. denied*, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967); Ruffin, *Out on a Limb of the Poisonous Tree: The Tainted Witness*, 15 U.C.L.A.L. Rev. 32, 61–80 (1967).

■ Similarly, the fact that Burke, Morrison, Francis, and Croucher originally were uncooperative, pleading not guilty and contesting the Government's charge that they were coconspirators in a massive marijuana smuggling operation, but later changed their attitude and testified to the truth of that which they had previously challenged, also points to attenuation. In this sense the instant case is much like *Smith v. United States, supra*. There the D.C. Circuit found that the testimony of a government eyewitness, whose identity was learned from defendants during their illegal detention, was not fruit of the poisonous tree because the taint had become attenuated. As evidence of attenuation, the court noted the fact that "when initially located [the eyewitness] gave no information adverse to appellants; only after reflection and the interaction of [his] faculties of human personality did [he] eventually relate to the jury the events of the night of the killing." *Id.* 117 U.S.App. D.C. at 4, 324 F.2d at 881–82 n.2. Writing for the majority, then Circuit Judge Burger stated:

> [T]he living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.

*Id.* 117 U.S.App.D.C. at 3, 324 F.2d at 881–82.

■ Our final reason for holding that the evidence derived from codefendants' testimony is not fruit of the poisonous tree goes to the very underpinnings of the exclusionary rule itself. Judge Wisdom, in the opinion in the first appeal of this case, correctly observed that

> [e]vidence should be excluded only where the benefit accruing to society from the additional deterrent against unlawful police practices equals or exceeds the detriment to society caused by the release of criminals.

*United States v. Houltin, supra*, 525 F.2d at 947. We agree. This Court is not convinced that the additional benefits of extending the exclusionary rule to the circumstances presented by this case would justify

the resulting further encroachment upon the public interest. *See, e. g., United States v. Calandra, supra,* 414 U.S. at 351, 94 S.Ct. at 621; *Alderman v. United States, supra,* 394 U.S. at 174–75, 89 S.Ct. at 967.[5] And even if we were so convinced, we still would be reluctant "to so extend the exclusionary rule in light of the current debate in the United States Supreme Court about the proper role of the exclusionary rule when one must balance between deterring police misconduct and protecting society by using reliable evidence to convict criminal offenders." *United States v. Cruz, supra, citing Stone v. Powell, supra.*

### II. Double Jeopardy

Defendants' second contention is that the Double Jeopardy Clause of the fifth amendment prevents their retrial because the entire evidence used to convict them resulted from illegal wiretaps. Thus, according to defendants, our previous reversal of their convictions because of these wiretaps was a finding of insufficiency of the evidence and we should have remanded their case with directions to dismiss the indictment.

The Double Jeopardy Clause protects an accused from government harassment by multiple prosecutions for the same offense. *See, e. g., Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). Balanced against this right of the accused is society's interest "in fair trials designed to end in just judgments," *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), a balance that generally allows the Government to try a successful appellant again. *See, e. g., Bryan v. United States,* 338 U.S. 552, 560, 70 S.Ct. 317, 321, 94 L.Ed. 335 (1950); *State of Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 462, 67 S.Ct. 374, 375, 91 L.Ed. 422 (1947); *Ball v. United*

States, 163 U.S. 662, 671–72, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896). Justice Harlan, in *United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964), explained the rule this way:

> Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment · because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest.

Like many general rules developed by balancing conflicting considerations, this rule of double jeopardy has exceptions. One such exception is that the Government may not retry a successful appellant if his reversal results from a finding of insufficiency of the evidence, if the Government can produce no additional evidence, and if the defendant did not move for a new trial in the district court. *See Forman v. United States,* 361 U.S. 416, 425–26, 80 S.Ct. 481, 486–87, 4 L.Ed.2d 412 (1960); *Sapir v. United States,* 348 U.S. 373, 374, 75 S.Ct. 422, 423, 99 L.Ed. 426 (1955); *Bryan v. United States, supra,* 338 U.S. at 559–60, 70 S.Ct. at 321; *United States v. Perez,* 5 Cir., 526 F.2d 859, 863 n.3, *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976); *United*

---

**5.** [U]se of the exclusionary rule as a means of controlling police practices is not without social cost. Regardless of the amount of unlawful police conduct which takes place, it is generally only those cases in which the unlawful conduct discloses strong evidence of guilt which reach the courts. Consequently, application of the doctrine of exclusion in any particular case usually means the release of a guilty individual. This result is wholly undesirable and should be minimized whenever possible. Exclusion is not intended to redress a wrong to the defendant by releasing him, but is designed only to curb undesirable police conduct. Therefore, complete immunity goes too far.

Note, *supra,* 115 U.Pa.L.Rev. at 1137.

*States v. Apollo,* 5 Cir., 1973, 476 F.2d 156, 158; *United States v. Robinson,* 5 Cir., 1972, 468 F.2d 189, 194; *United States v. Musquiz,* 5 Cir., 1971, 445 F.2d 963, 966; *United States v. Goodson,* 5 Cir., 1971, 439 F.2d 1056; *United States v. Nall,* 5 Cir., 1971, 437 F.2d 1177, 1187.

 Defendants Houltin and Phillips contend that their case falls within this exception. The record and the law indicate otherwise. A careful reading of this Court's opinion in defendants' first appeal clearly establishes that we grounded the reversal of their convictions upon a procedural defect in the trial court—the admission of evidence resulting from the illegal wiretaps. At no point in our opinion did we state that there was insufficient evidence to convict defendants. Indeed, when defendants, after denial on retrial of their motion to dismiss the indictment, sought clarification from this Court on this same double jeopardy issue, we granted the motion for clarification and, in our order dated April 1, 1976, stated that the Government "may reprosecute the appellants Houltin and Phillips, but may not use fruits of the wiretaps that we have declared illegal."

It is axiomatic that the fifth amendment Double Jeopardy Clause does not prohibit the Government from retrying a defendant whose conviction has been set aside on procedural grounds. *See, e. g., United States v. Ewell,* 383 U.S. 116, 121, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966); *United States v. Tateo, supra; Forman v. United States, supra; Thomas v. United States,* 5 Cir., 1971, 450 F.2d 317, *cert. denied,* 409 U.S. 859, 93 S.Ct. 143, 34 L.Ed.2d 104 (1972); *United States v. Jasso,* 5 Cir., 442 F.2d 1054, *cert. denied,* 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81 (1971). That is the case here. Defendants' argument therefore is without merit.[6]

---

**6.** Defendants in their brief point to *United States v. Robinson, supra,* as further authority for their double jeopardy claim. In that case this Court reversed the convictions of two defendants convicted solely upon evidence gleaned from two illegal wiretaps. On the basis of *United States v. Musquiz, supra,* we remanded the case to the district court with directions to dismiss the indictment because the defendants did not move the trial court for a new trial and because "the entirety of the evidence used to convict these defendants is conceded to have eventuated from these improperly authorized wiretaps." 468 F.2d at 194. In the instant case, however, the Government made no such concession and upon retrial once again produced overwhelming evidence of defendants' guilt. *Robinson,* therefore, is inapposite to this appeal.

### III. Conclusion

Justice Holmes, in one of his typically well-reasoned dissents, commented:

> It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis.

*Hyde v. United States,* 225 U.S. 347, 391, 32 S.Ct. 793, 811, 56 L.Ed. 1114 (1912) (Holmes, J., dissenting). This, we think, is particularly true with respect to the fruit of the poisonous tree doctrine, and, to a lesser but still very real extent, the often heard cry of double jeopardy. On their face, defendants' assertions of tainted evidence and multiple prosecutions may seem meritorious. Careful, reasoned analysis demonstrates otherwise. This Court has never tolerated the violation of anyone's constitutional rights, particularly those of a criminal accused; our vindication has been swift and hard. But in this case, there were no such violations.

The judgment of the district court is AFFIRMED.

WISDOM, Circuit Judge, dissenting:

I respectfully dissent. The majority opinion at best renders meaningless and at worst overrules, without an en banc hearing, a decision of another panel of this Court, *United States v. Houltin,* 5 Cir. 1976, 525 F.2d 943, *vacated in part sub nom., Croucher v. United States,* 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745, *modified* 5 Cir. 1977, 553 F.2d 991 *(Houltin I).* In *Houltin I* we reversed the convictions of Houltin and Phillips because government agents, both federal and state, violated the fourth amendment by using illegal wiretaps; the

two defendants, unlike their convicted co-conspirators, had standing to challenge the inadmissible evidence. Here, by granting immunity to the four convicted coconspirators, who were then in effect compelled to testify to the same evidence excluded in the earlier case, the prosecution erased the holding in *Houltin I* as to Houltin and Phillips, the two defendants-appellants in this case.

This case does not fall within the recognized exceptions to the exclusionary rule, a rule offensive to one's sense of justice in many cases, but a rule that makes the fourth amendment meaningful over the long term. First, I cannot accept the majority's conclusion that the coconspirators' coerced testimony in this case came from a source independent of an admittedly illegal wiretap.[1] Second, the connection between the evidence introduced and the primary illegality had not become so attenuated as to dissipate the taint. The majority has ignored the purposes of the exclusionary rule and the doctrine of the fruit of the poisonous tree, and has given law enforcement authorities a substantial inducement to use unauthorized wiretaps in future investigations.

The majority does not rely on a per se rule that witness testimony can never be tainted. After the leading case of *Wong Sun v. United States*, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, some decisions supported that view. *Smith and Bowden v. United States*, D.C. Cir. 1963, 324 F.2d 879; *Brown v. United States*, 1967, 126 U.S.App. D.C. 134, 143, 375 F.2d 310, 319 (Burger, J., concurring) *cert. denied*, 1967, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359. But a per se approach did not become the law. Instead, witness cases involving live testimony are to be analyzed as any other derivative evidence cases are analyzed. *United States v. Marder*, 5 Cir. 1973, 474 F.2d 1192, 1196; *see generally* Ruffin, *Out on a Limb of the Poisonous Tree: The Tainted Witness*, 15 U.C.L.A.L.Rev. 32 (1967).[2]

Evidence that is fruit of the poisonous tree is excluded, as Justice Holmes, speaking for the Court, said, because the essence of exclusionary rule is not merely "that . . . evidence so acquired shall not be used before the Court but that it shall not be used at all". *Silverthorne Lumber Co. v. United States*, 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321. The government may avoid the exclusionary rule for derivative evidence if it can show either that the evidence came from an independent source or that the relation of the evidence to the primary illegality is so attenuated that the taint is dissipated. *United States v. Castellana*, 5 Cir. 1974, 488 F.2d 65, 67 *rev'd on other grounds*, 5 Cir., 500 F.2d 325 (en banc).

---

1. The government did not contest on appeal the district court's ruling that a wiretap of a conversation between Houltin and his wife and another between Mrs. Houltin and Mrs. Phillips were unlawful. *United States v. Houltin*, 5 Cir. 1976, 525 F.2d 943, 945.

2. The majority points to the advice in *Williams v. United States*, 5 Cir. 1967, 382 F.2d 48, 51 that "the significance of the nexus between an illegal search and challenged evidence is one of common sense . . . " This is sound advice, but it can be misunderstood. In derivative evidence cases it is not unusual for the defendant's counsel to offer sophisticated argument to show a causal connection between information obtained through illicit wiretapping and the government's proof; and, of course, appellate courts should scrutinize such arguments. *Nardone v. United States*, 1939, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307. "Common sense", if it has judicial acceptance in this context, may cut through a lawyer's quiddities to show that a connection is less significant than the lawyer asserts. *Id.* But what seems "common sense" to individual judges cannot be used as a substitute for accepted standards, rules, policies, and principles. It is certainly no substitute for consideration or analysis of the logical relationship between evidence obtained by an illegal wiretap and the exploitation of the evidence to convict defendants. In the context of this and similar cases, "common sense" should serve as a check on the specious reasoning defendants' imaginative counsel devise for sophistical causation, not as the primary basis for decision. Otherwise, the fate of a criminal defendant varies with the vagaries of the judges who happen to review his case. *Cf. Adamson v. California*, 1947, 332 U.S. 46, 68, 67 S.Ct. 1672, 91 L.Ed. 1903 (Black, J., dissenting) (warning of the danger of allowing judges to substitute their own concepts of decency and fundamental justice for the language of the Bill of Rights).

The facts and circumstances of this case do not fit within the independent source exception to the derivative evidence exclusionary rule. *Wong Sun* established that evidence is not fruit of the poisonous tree simply because it would have been undiscovered *but for* the primary illegality by the police. *Wong Sun* did not, however, reject a "but for" inquiry entirely. That inquiry survives as the controlling question for the independent source exception. Ruffin, 15 U.C.L.A.L.Rev. at 38. Evidence has an independent source when the prosecution can show it was uncovered in a manner with no connection at all to the primary illegality such as wiretapping. *See, e. g., United States v. Villarreal,* 5 Cir. 1978, 565 F.2d 932 (Wisdom, J., dissenting); *United States v. Castellana,* 5 Cir. 1974, 488 F.2d 65, *rev'd on other grounds,* 5 Cir. 1974, 550 F.2d 325 (en banc); *United States v. Bacall,* 9 Cir. 1971, 443 F.2d 1050, *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557; *Collins v. Beto,* 5 Cir. 1965, 348 F.2d 823, 828.

*United States v. Holsey,* 10 Cir. 1970, 437 F.2d 250, a case cited in the majority opinion, serves as an example. In *Holsey,* the police had illegally searched the defendant's rented house and his automobile. The police found evidence of an automobile purchase by someone using the name Jack Weber which would have advanced their investigation had the police not already known all the facts the evidence revealed. The court refused to hold that testimony by witnesses uncovered by the investigation was tainted. It stressed that "such knowledge obtained by the search gave the F.B.I. Agents no information they did not have before . . . ." 437 F.2d at 253.[3] One commentator, who emphasizes the need for special care when law enforcement officials have used unlawful electronic surveillance, believes that the independent source exception should be available in wiretapping cases only when the government can establish "that its agents had utilized that source before gaining knowledge by the unlawful method". Pitter, *"The Fruit of the Poisonous Tree" Revisited and Shepardized,* 56 Cal.L.Rev. 579, 645 (1968).

Against this legal background it is clear to me that the independent source rule does not permit use of the testimony of the convicted coconspirator. The government did not have a fruitful source for the evidence before the taps. Although the federal agents knew the identities of all the conspirators, they had been unable to develop a case. Indeed, this inability to prove their case caused the investigators to place the illegal wiretap. *Houltin I,* 525 F.2d at 947.

Furthermore, there are several important connections between the primary illegality and the testimony introduced at the second trial. The witnesses had been confronted with the results of the tap; inevitably this influenced the content of their testimony. *See generally* Pitter, 56 Cal.L.Rev. at 592–93, *cf. Grant v. Wainwright,* 5 Cir. 1974, 496 F.2d 1043, 1048 n.5 (repetition may lead witness to believe his own false confession). The prosecution exploited the wiretaps in its grant of immunity to compel the testimony. Only because of the wiretap evidence did the prosecutor have available four witnesses who could be "immunized" without cost. They were already convicted, so an inability to use their testimony against them was meaningless. The government might have convicted Houltin by immunizing Phillips or vice-versa. Either of those grants of immunity, however, would have required paying the usual costs of the immunity procedure.[4] The information from the wiretaps made those convictions possible. Moreover, the information from the wiretaps determined who had standing in *Houltin I.* This in turn identified the witnesses to be given immunity. *Cf. United States v. Marder,* 474 F.2d at 1195; *United*

---

3. *United States v. Marder,* 5 Cir. 1973, 474 F.2d 1192, the other case cited by the majority, states the independent source exception but did not admit any evidence because of it.

4. The government might also have immunized Burke, Morrison, Francis, and Croucher before the first trial. That course, however, also might have kept some of the conspirators out of jail.

*States v. Tane,* 2 Cir. 1964, 329 F.2d at 848, 853 (testimony of witness identified through illegal tap is tainted).[5]

Because a but-for causal link exists between the unlawful wiretap and the testimony introduced at trial, that evidence could be considered only if it had become so attenuated from the unlawful tap that the taint was dissipated. *See Wong Sun v. United States,* 371 U.S. at 487–88, 83 S.Ct. 407, *Nardone v. United States,* 308 U.S. at 341, 60 S.Ct. 266. The majority believes the evidence is attenuated because the coconspirators came forward by their own volition and because they changed from uncooperative defendants to prosecution witnesses.

The majority thus adopts the will and volition approach to tainted witnesses. Attenuation is supplied by the human factor involved when evidence comes from witness testimony. Courts employing this analysis "must determine how great a part the particular manifestation of 'individual human personality' played in the ultimate receipt of the testimony in question." *McLindon v. United States,* 1964, 117 U.S.App.D.C. 283, 286, 329 F.2d 238, 241 n.2. "The point to scrutinize, then, is . . . between the ears of the witness" Ruffin, 15 U.C.L.A.L. Rev. at 50. This approach has been criticized—in an article Judge Gewin termed "excellent" in *United States v. Marder,* 474 F.2d at 1196 n.4—because it is vague, "spurious and unnecessary", and so manipulable that any decision can be justified. Ruffin, 15 U.C.L.A.L.Rev. at 39, 64. It has, however, been accepted to some extent in this Circuit. *See United States v. Marder,* 474 F.2d at 1196.

Even within the framework of the will and volition analysis, I cannot understand how the majority concludes that the testimony below resulted from an independent human decision to testify. The government has the burden of showing the evidence is attenuated. *Houltin I,* 525 F.2d at 947. The witnesses did not come forward voluntarily;[6] they were arrested, tried, convicted, and then ordered to testify. They had no choice but to obey that order to give evidence; the alternative was a contempt citation, as their lawyer so advised them.

To negate the obvious coercion to testify—coercion made possible by exploitation of the illegal wiretaps—the majority can only speculate that the co-defendants chose to testify to enhance the possibility that their then-pending Rule 35 motions for a reduction of sentences would be granted. Of course, the co-defendants had sentences to be reduced only because of wiretap evidence. It is just as easy, as the majority concedes, to conclude that their fear that failure to testify would have an adverse impact on the Rule 35 motions increased the coercion on the defendants.

The majority does not cite any support in the record for its theory that attenuation can be found in the exercise of the co-defendants' own wills, for there is none. To the contrary, in the record the United States Attorney stated "none of the four [witnesses] want to testify but they recognize under the law they have an obligation to do so".[7] Transcript at p. 28. The trial judge acknowledged that the witnesses "don't want to testify". *Id.* at 33.

The majority's argument that attenuation is shown because Burke, Morrison,

---

**5.** Houltin and Phillips do not have standing to complain for their coconspirators that the immunity grants were improper. They do have standing, however, to protest any use of the illegal wiretaps which leads to evidence against them, including use of the wiretaps to create the possibility of meaningless immunity and compelled testimony.

**6.** The majority sees a distinction between "volunteered" testimony and "voluntary" testimony. The editors of Webster's Third International Dictionary would not agree. Their defi-

nition of "volunteer" is "to offer or bestow *voluntarily* or without solicitation or compulsion". (Emphasis added.)

**7.** Webster's Third International Dictionary defines "voluntary" as "proceeding from the will: produced in or by an act of choice . . acting or done *without any present legal obligation* to do the thing done or any such obligation to do the thing done or any such obligation that can accrue from the existing state of affairs". (Emphasis added.)

Francis, and Croucher changed from uncooperative to cooperative parties is similarly contradicted by the United States Attorney's statement.[8] The four never wanted to cooperate by testifying. *Cf. Smith and Bowden v. United States,* 1965, 120 U.S. App.D.C. 160, 344 F.2d 545 in which the court excluded the testimony of a tainted witness who did not change from uncooperative to cooperative, but who was always cooperative. In contrast, in *Smith v. United States,* cited by the majority, the witness changed his story voluntarily, without coercion of contempt.

As the majority points out by quoting Mr. Justice Holmes, reliance on phrases such as "independent" or "attenuated" can lead to superficial legal analysis. One means of avoiding the danger in a derivative evidence case is also to analyze its facts in light of the policy behind the exclusionary rule of deterring official misconduct. *See* Note, *Fruit of the Poisonous Tree—A Plea for Relevant Criteria,* 115 U.Pa.L.Rev. 1136 (1967).

My conclusion that the testimony in the case is tainted is buttressed by an examination of the case from this perspective. Allowing this evidence to be introduced will not deter official misconduct; it will encourage illegal wiretaps. After this decision, a government agent investigating a conspiracy case who could not obtain permission to use a wiretap (or who did not seek permission) could place an unlawful tap on one conspirator's telephone, wait until he overheard an incriminating call to which at least one conspirator lacked standing to attack, and use the call to convict that defendant. After the conviction, that defendant would be granted immunity. He would then be forced to testify against the other conspirators. The wiretap in this case was unlawful only because the investigator failed to comply with a technical requirement of 18 U.S.C. 2516(2).[9] Nothing in the majority opinion, however, restricts the loophole to good faith misconduct.

The majority ignores this difficulty. Instead, it states its reluctance to extend the exclusionary rule. To my mind, to exclude the testimony in this case would not extend the exclusionary rule, but apply it in exactly the situation the Supreme Court has said exclusion is appropriate: when necessary to control official unlawfulness. *See Stone v. Powell,* 1976, 428 U.S. 465, 96 S.Ct. 3037, 3047–49, 49 L.Ed.2d 1067. That no court has ever excluded evidence in a comparable fact situation does not mean a decision to exclude would extend the exclusionary rule. It probably means that no prosecutor has ever dared to attempt to use the procedure sanctioned by the Court today.

Finally, I am concerned that two of three judges on the panel in this case, in effect, eradicate the holding of this Court in *Houltin I*—with respect to Houltin and Phillips. In *Houltin I* this Court held that Houltin and Phillips had standing to challenge the unlawful taps, and reversed their convictions. That standing is now an empty privilege. The majority here holds that a defendant with standing against the primary illegality can do nothing when the government exploits the tainted evidence not only to convict defendants without standing but to convict the defendant with standing by compelling those without standing to testify. There is no longer any reason for a member of a conspiracy to exercise his right as an individual citizen to protest an unlawful wiretap—unless all members of the conspiracy share his standing.

Houltin and Phillips may be guilty. Ringleaders in a criminal conspiracy have a way of interposing layers of less important conspirators between the criminal offense and the hard proof of the ringleaders' guilt. *See Houltin I,* 525 F.2d at 951–52. But there is no legitimate evidence here that is admissible against the defendants.

It is indisputably a policy of our society that criminals be speedily apprehended

---

8. Even if the attitude of the witnesses had changed, I do not believe this would prove that the evidence was so attenuated as to dissipate the taint of the wiretap. *See* Ruffin, 15 U.C.L. A.L.Rev. at 54–55.

9. See footnote 1 of the majority opinion.

and justly convicted. But in pursuing this aim we must sedulously avoid prejudicing other, and higher goals. One such goal is certainly a cutting down of the incidence of unlawful conduct against private persons by public officials.

*Collins v. Beto*, 348 F.2d at 831. The testimony of Burke, Morrison, Francis, and Croucher was tainted by the wiretap.

The "exclusion of relevant criminal evidence is a high price to pay for judicial enforcement of the fourth amendment." [10] But the admission into evidence of the products of unconstitutional searches (wiretaps) as a means of convicting once-tried defendants whom the prosecutor considers should be retried and convicted can only induce official unconstitutional searches. I would reverse.

---

**10.** Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 433 (1974).