STATE OF NEBRASKA, APPELLEE, V. C. MICHAEL
ANDERSON, APPELLANT.
STATE OF NEBRASKA, APPELLEE, V.
PETER HOCHSTEIN, APPELLANT.
296 N.W.2d 440

Filed August 15, 1980.   Nos. 42301, 42302.

52

David S. Lathrop, Terry M. Anderson, and John E. North, Jr., of Lathrop, Albracht & Swenson for appellant Anderson.

J. Joseph McQuillan of Walsh, Walentine & Miles and Michael J. Lehan of Kelley & Kelley for appellant Hochstein.

Paul L. Douglas, Attorney General, Mel Kammerlohr, and Paul E. Hofmeister for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, and WHITE, JJ., and COLWELL and FAHRN-BRUCH, District Judges.

KRIVOSHA, C.J.

The instant appeals, though involving two separate cases, result from a consolidated trial arising out of a common crime and involve essentially identical issues. For that reason, we have elected to, likewise, consolidate the two cases for purposes of our decision.

On July 1, 1977, appellants, Peter Hochstein (Hochstein) and C. Michael Anderson (Anderson), were separately charged by information in the county court of Douglas County, Nebraska, with first degree murder in the death of Ronald J. Abboud (Abboud). Hochstein and Anderson were bound over to the District Court for Douglas County, Nebraska, which, after consolidating the matters, heard and ruled on numerous pretrial motions, some of which are involved in this appeal. After trial, both appellants were found guilty as charged and sentenced by a three-judge panel to be executed.

Hochstein and Anderson both appeal from the conviction and sentence, assigning a number of errors which we shall individually discuss hereafter. We have, however, carefully and meticulously reviewed this matter and conclude that it is, in all respects, correct. We, therefore, affirm both the conviction and the sentence.

The body of Abboud was discovered on November 2, 1975, along a creek bank in a rural area west of Omaha, Nebraska. Abboud had been reported missing and had last been seen on October 29, 1975. The investigation, including the autopsy conducted on the body of Abboud, disclosed that Abboud had been shot in the head, back, and neck with a .22 caliber pistol. Soon after the body was found, the investigation led police to suspect both Hochstein and Anderson as being involved in the killing. Anderson had been employed by Abboud's company, Commercial Realty, for several years and Hochstein was a close friend of Andersons. Despite the suspicions, however, the authorities had been unable to effect an arrest of any suspect by June of 1976.

At that time, the Abboud family hired a private detective by the name of Dennis Whelan (Whelan). Whelan was specifically instructed by the Abboud family that he was to establish the guilt or innocence of Anderson and Hochstein. Likewise, at the time of the hiring by the Abboud family, Whelan was further made aware of a Lon Reams (Reams) who was known to have a business and social relationship with Anderson.

An examination of the police reports prepared up to the time of Whelan's hiring by the Abboud family disclosed that the police considered Reams as a possible witness to an incriminating statement made by Anderson concerning Abboud. Likewise, in a report dated November 10, 1975, it is shown that Reams was interviewed by the police and his name was again mentioned in a report dated May 20, 1976, as a business partner of Anderson's. Further, a report of June 29, 1976, discloses that the police, while searching for Anderson at his place of business, spoke briefly with Reams.

Whelan proceeded to investigate the murder through the means of interviews, visual surveillance, record checking, and the reading of police reports which had been provided to him by an unknown source.

Beginning on November 12, 1976, Whelan began installing and monitoring electronic surveillance devices in the apartments of Anderson and Hochstein. This continued until April 21, 1977.

In December of 1976, Whelan learned that a woman he knew, Mila Dickman (Dickman), was employed by Bruce Miller and Anderson and that she was closely associated with Reams. Whelan interviewed her and told her of his suspicions that Reams, Anderson, and Hochstein were the persons who had killed Abboud. Dickman agreed to aid Whelan by passing on any information that she might learn concerning the three. Whelan and Dickman subsequently met on frequent occasions and Dickman told Whelan that Reams felt that he was being edged out of his association with Anderson and Hochstein.

On April 15, 1977, Whelan met with Samuel Cooper (Cooper) of the Douglas county attorney's office. At this meeting, which lasted approximately 3 hours, Whelan informed Cooper of his own investigation, including the illegal wiretaps, and played portions of at least one of the taped conversations for Cooper. He also told Cooper that he felt Reams was directly involved in the Abboud homicide, along with Anderson and Hochstein. Cooper later testified at a hearing on a motion to suppress that Whelan's information concerning Reams gave him nothing more than he already had.

During their meeting on April 15, 1977, Whelan was specifically instructed by Cooper that he was to terminate his illegal wiretapping. Cooper furthermore implied to Whelan that, if Reams would talk to Cooper, that Cooper would consider granting Reams immunity from prosecution.

On June 7, 1977, Reams was interviewed by Cooper and Douglas County Attorney Donald Knowles. Reams denied having any knowledge of or involvement in the

Abboud murder. Whelan was again contacted by Cooper and asked to do whatever he could to assure Reams that, if he was not directly involved in the murder, but had knowledge of it, he would be treated fairly by the county attorney's office.

On June 13, 1977, Whelan talked to Reams in the presence of Dickman and advised Reams to tell the county attorney what he knew about the murder. Whelan told Reams that he had "conversations" which indicated Anderson and Hochstein were planning to do away with Reams. Whelan later testified that he tried to play on Reams' paranoia and that he told him "the case was made and that his only chance ... was to make a deal .... I tried to bluff him, I tried to scare him." The record does not disclose that any such conversation between Hochstein and Anderson actually occurred, but rather established that Whelan did not hear and record such conversations between Hochstein and Anderson and, in fact, was bluffing Reams. Reams told Whelan that he would think it over and contact an attorney.

On June 15, 1977, Reams and Whelan met again and Reams told Whelan that he had contacted an attorney and asked him to get in touch with Cooper. Also on June 15, 1977, when Whelan and Reams met again, Reams admitted that he was involved in the murder. That afternoon, he and his attorney met with Cooper and Reams gave a complete statement about the murder, naming Hochstein and Anderson as the persons responsible and acknowledging the part he, himself, had played in the murder. Reams' testimony at the trial was central in obtaining the guilty verdicts.

Reams' testimony at trial disclosed that he and Anderson had met early in 1975. In May of that year, Anderson began to tell Reams of his negative feelings toward his employer, Abboud, and he began to speak more often about his dislike for Abboud due to Abboud's alleged unfair business dealings and intimated that he would like to do something about it.

About a week before the murder, Anderson first revealed an intention to take some action toward

Abboud. Anderson, Hochstein, and Reams had gathered at Reams' house to drink beer and the conversation turned to Abboud. The three began discussing the possible means of eliminating Abboud, going from hiring local or outside "hit men," to the use of a knife, to the use of explosives. Again, just a few days later, the three met at Reams' house and began to seriously plan out the murder. Hochstein, after fixing a malfunctioning Ruger pistol belonging to Reams, suggested that he might "do it," meaning murder Abboud, because he needed money. He mentioned a price of $1,500 which Anderson agreed upon as fair. The parties then planned out how Hochstein could get Abboud off alone. They decided that Hochstein should play the part of a prospective purchaser of real estate to whom Abboud would be asked to show some property listed with his company. Hochstein was to use the name "Jim Parker" in his dealings with Abboud. Anderson knew of a piece of agricultural property listed with Commercial Realty located at about 168th and Q Streets which might be "a good spot." They all then got into Hochstein's car and drove out to the property in question. Although they remained in the car, Anderson described the lay of the land for them. Hochstein kept the Ruger pistol after this meeting.

Reams further testified that the "hit date" was originally scheduled to be Tuesday, October 28, 1975. The previous day, Anderson and Reams had gone to the bank to borrow the $1,500 necessary to pay Hochstein. The money was given to Hochstein that afternoon.

The plan was for Hochstein to arrange an appointment with Abboud to see the real estate listed by Commercial Realty. Once they were alone on the property, the murder was to take place. Hochstein was then to call Reams who, in turn, would call and inform Anderson. Then Reams was to go and pick up Hochstein. Hochstein arranged the appointment with Abboud for Tuesday afternoon, October 28, 1975. However, Reams later received a telephone call from Hochstein,

presumably from Abboud's car telephone, identifying himself as "Jim Parker." Hochstein informed Reams that he was with a few gentlemen. Later that day, he again called, this time from the Smuggler's Inn, a restaurant, where he had been left by Abboud. Reams picked up Anderson and went to pick up Hochstein, who told him that he hadn't been able to carry out the plan because there had been two other people in the car. However, Hochstein was going to call Abboud to set up another meeting for the next day.

The next morning, October 29, 1975, Hochstein again called Abboud and set up an appointment. The next contact Reams had with Hochstein was a telephone call at about 4 or 4:30 that afternoon. Hochstein simply said, "It's done," and told Reams to pick him up at Westroads, a shopping center located in Omaha. Reams called Anderson and then went out to pick up Hochstein. The body of Abboud was found 4 days later.

After Hochstein and Anderson were bound over to the District Court for Douglas County, Nebraska, they moved to suppress all evidence obtained as a result of the illegal electronic surveillance undertaken by Whelan. After a hearing on the matter, the Honorable John T. Grant ordered the suppression of a substantial portion of the State's evidence, including the testimony of Lon Reams.

Pursuant to the provisions of Neb. Rev. Stat. § 29-824 (Reissue 1979), the State appealed the decision to a single judge of the Nebraska Supreme Court who, on April 12, 1978, rendered a judgment and opinion affirming the District Court's order except as to the testimony of Lon Reams. As to the Reams' testimony, the single judge held that the evidence was admissible.

Thereafter, the case proceeded to trial, after which the jury returned a verdict of guilty of murder in the first degree against each appellant. A three-judge panel was appointed as prescribed by statute and, after hearing, the panel entered its order of sentence imposing the death penalty upon each appellant. It is from these

verdicts and sentences that the appellants appeal, claiming a number of errors.

The first, and perhaps the most serious, assignment of error raised by appellants has to do with the testimony of Lon Reams. Specifically, the appellants maintain that it was error not to suppress the testimony of Reams. However, our examination of the evidence and the law in that regard leads us to the conclusion that it was not error to permit Reams to testify. We reach our decision both because his identity was not made known by reason of an illegal wiretap and because his decision to testify was voluntary, thereby attenuating the taint, if any, of the illegal wiretap.

Appellants maintain that Reams' testimony was, indeed, the "fruit of the poisonous tree" obtained by Whelan and, as such, should not have been permitted. Their argument is based upon the provisions of Neb. Rev. Stat. § 86-712 (Reissue 1976) which is essentially identical to Title 18 U.S.C. § 2515 (1976) and reads, in part, as follows: "No part of the contents of any intercepted wire or oral communication and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of Chapter 86, article 7."

It is argued to us that the provisions of the above-cited statute should apply without regard to whether the illegal interception is made by a private citizen or a government agent. There appear to be no cases directly addressing the question of what happens when the wiretap is conducted by a private citizen, as opposed to a government agent. However, the facts of this case do not require us to decide that issue at this time. Regardless of who instituted the illegal wiretaps in the instant case, the only questions under either the cited act or the fourth amendment necessary for our decision are (1) Was the existence of Reams as a potential witness known by means other than the illegal wiretap? and (2) Did Reams voluntarily agree to testify? If the answer to either of those questions is in the affirmative, then all of the

argument concerning the meaning and effect of § 86-712 is of no moment.

In all of the cases cited to us by appellants in which the live witness' testimony was suppressed, the existence of the witness was first brought to the government's attention by reason of the illegal wiretap or search. The evidence in each of those cases clearly points out that, but for the illegal activity conducted by the government, the existence of the witness would never have been known to the government. *United States v. Tane*, 329 F.2d 848 (2d Cir. 1964); *United States v. Huss*, 482 F.2d 38 (2d Cir. 1973); *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106 (1972); *United States v. Cruz*, 581 F.2d 535 (5th Cir. 1978). The prohibition against using the live witness is not, however, based upon a "per se" rule. If it appears from the evidence that the identity of the witness was obtained from a legal source, the fact that the identity of the witness was also improperly acquired by illegal wiretapping does not render the witness' testimony inadmissible. In *Nardone v. United States*, 308 U.S. 338, 341 (1939), the United States Supreme Court, in reviewing the prohibition against using improperly obtained testimony under § 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605 (1934), speaking through Mr. Justice Frankfurter, said:

"Here, as in the *Silverthorne* case, the facts improperly obtained do not 'become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it' simply because it is used derivatively. [Citation omitted.]

"In practice this generalized statement may conceal concrete complexities. Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. A sensible way of dealing with such a situation — fair to the

intendment of § 605, but fair also to the purposes of the criminal law — ought to be within the reach of experienced trial judges. The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that the wire-tapping was unlawfully employed. Once that is established — as was plainly done here — the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin."

In the *Tane* case, relied upon by appellants, unlike the instant case, the identity of the witness was derived from the wiretap. The witness was unwilling to testify or even admit to making any unlawful payments until possession of tapes of a certain conversation was revealed by the assistant district attorney. In the instant case, Reams' identity was not derived from any wiretap and his willingness to testify, as will be discussed in a moment, was not dependent upon any wiretap which implicated Reams in the crime.

Appellants have further cited to us the case of *United States v. Marder*, 474 F.2d 1192 (5th Cir. 1973), in support of their position that Reams' testimony should have been suppressed as a fruit of the poisonous tree. The *Marder* decision, however, stands for a contrary rule. The court in *Marder* said:

"We do not adopt a per se rule which would *ipso facto* preclude the utilization of all testimony of a witness identified as a consequence of an illegal search. Many extenuating circumstances may affect the appropriateness of the introduction of such testimony, which would not pertain to an inanimate object seized by an illegal search.

. . . .

". . . Several factors should be considered in deciding whether the attenuation rule is applicable to 'live testimony.' The unpredictability of the human will,

which is necessarily involved in the use of a witness to prove essential elements of a crime, forecloses the adoption of any rigid rules. 'Thus, each case must be examined on an ad hoc basis, considering the particular facts presented, rather than on any sweeping general concept of "live testimony" as such.' [Citation omitted.]" *Id.* at 1196. See, also, *United States v. Holsey*, 437 F.2d 250 (10th Cir. 1970); *Smith v. United States*, 324 F.2d 879 (D.C. Cir. 1963).

The record clearly establishes that the witness Reams was not unknown to either Whelan or the State prior to the illegal wiretaps. When Whelan was first hired by the Abboud family, he was specially advised that Reams may be a suspect or at least a party with information. The police, though perhaps not as vigorously as they might, had pursued Reams and made inquiry concerning his having heard Anderson make some threatening statements concerning Abboud. Whelan arranged a contact with Mila Dickman who, in turn, kept Whelan advised about the fact that Reams was getting nervous and felt he was being "edged out" of his association with Anderson and Hochstein. There is no evidence in the record to support the position that, but for the illegal wiretap, either the existence of Reams or the fact that he might testify would have been unknown.

The record establishes the fact that nothing heard during the illegal wiretap led the State to Reams. Exhibit 43 best illustrates this fact. Exhibit 43 is a report made by Whelan to the Abboud family and reads, in part:

"Monday, 6-13-77

"Talked with Cooper, aware of Lon's whereabouts. Cooper still thinks Lon was not involved but knows what happened. We decided that Mila and I should talk with Lon and make a deal.

". . . Lon had been at her home all week-end and was acting very nervous, upset over something. Plan decided on: Mila is to talk with Reams this afternoon and tell him of her involvement with me and that the case is coming down with Reams as a conspirator; he will be charged

with murder. Also, it is now known that Anderson, Pete and Leo are going to kill Lon. Mila also believed this and was placed in the middle. Both had to make a decision — Reams arrested or Reams killed. Mila agreed to talk with Lon and go for the confession. She agreed to give Lon enough information so that he would believe that he had no out and that Cooper had enough for the arrest." Of course, none of the "facts" to be related to Reams were true and were not obtained as a result of any illegal wiretap.

We, therefore, conclude that the identity of Reams was made known to the State by independent means and was not the sole result of an illegal wiretap. It was, therefore, not the fruit of a poisonous tree and it was not error for the court to permit Reams' live testimony to be admitted into evidence.

Having, therefore, answered the first question posed at the outset of this discussion in the affirmative, we now turn to the second question. That is, regardless of the illegal wiretaps, did Reams voluntarily come forward and offer to testify so as to attenuate any taint, if such a taint existed? Again, we believe that this question must be answered in the affirmative.

When Reams was first contacted by the county attorney's office, he denied any knowledge of the crimes and refused to talk to Cooper.

It was only after Whelan told him that his life was in danger and that he should cooperate in return for immunity, that he sought out counsel. After he consulted with counsel of his choice, he apparently came to the conclusion that he was being offered a chance of a lifetime and came forward and offered to testify in return for the promise of immunity. To be sure, Whelan had no evidence that Reams was to be killed and was lying to Reams. In his testimony, Whelan stated as follows:

"Q. Did you obtain any information with respect to Mr. Reams?

"A. I don't think so, no.

"Q. Did you reveal any of the conversations off that wire tap to Mr. Reams?

"A. No, sir.

"Q. Did you ever at any time play any of the conversations to Mr. Reams?

"A. Never.

"Q. And you testified that you implied to Mila and to Lon Reams that he was in danger?

"A. I implied that, yes, to Lon and Mila.

"Q. In danger from what?

"A. In danger from his associates.

"Q. Did you have any factual basis for that?

"A. No, sir. All I was trying to do was play on his own paranoia at the time. . . .I would have to say that alot of it was made up. I was bluffing him. . . .

"Q. Now, you testified that I [Cooper] didn't authorize you to grant immunity to anybody. That is correct, isn't it?

"A. That is correct.

"Q. But it was also clear from our conversation that that was the intent if Mr. Reams was to come forward, wasn't it?

"A. That was what I drew from it.

"Q. And that's basically what you told Mr. Reams, wasn't it?

"A. I told him that I thought he should get a lawyer and, through the lawyer, make a deal for immunity."

Reams could easily have asked to hear the alleged tapes. Such a request would have quickly disclosed that the tapes did not exist. Apparently, neither the threats nor the tapes were a moving factor in Reams' decision to testify. On advice of counsel, the offer of immunity undoubtedly did more than anything else to cause Reams to come forward. Reams had every opportunity to reflect on the entire matter and to consult with his attorney before voluntarily offering to testify.

The fact that Whelan may have overheard a conversation between Hochstein and Anderson in which Reams was mentioned did not affect the State's right to use the

information against Reams. In *Goldstein v. United States*, 316 U.S. 114 (1942), it was held that the use of an intercepted telephone message to induce witnesses to testify in a criminal prosecution, even though it may constitute a violation of the provisions of § 605 of the Federal Communications Act, 47 U.S.C. § 605 (1976), forbidding the use of intercepted communications, does not render such testimony inadmissible against a person not a party to the message where no use is made at the trial either of the message itself or of any information contained therein. Likewise, in the case of *United States v. Scotten*, 428 F. Supp. 256 (D. Nev. 1976), the United States District Court for the District of Nevada held that, although evidence seized at an illegal search of a warehouse had been suppressed as to the defendant because of his proprietary interest in the premises, testimony of an unindicted coconspirator who became a government witness would not be suppressed with respect to the defendant although the seized evidence which was useable against the defendant was a substantial factor leading to the decision of the unindicted coconspirator to cooperate with the government. The court found that the decision of the witness to turn state's evidence was an independent act of free will which was not affected or obtained in any respect by wrongful exploitation of evidence seized or obtained in violation of his right of privacy.

Reams had much to gain by agreeing to testify in return for the offer of immunity. To suggest that his offer to testify was not voluntary under the facts is to attempt to ignore the facts as detailed earlier in this opinion. It was, indeed, voluntary and most beneficial to Reams. We are, therefore, unable to agree with appellants that Reams' live, in-court, testimony should have been suppressed. It was clearly voluntary and properly admissible, though admittedly damaging to the appellants.

Having so disposed of that issue, we shall now proceed to examine the remainder of the issues raised by

appellants. Appellant Hochstein claims that the trial court erred in failing to grant his oral motion for severance. The cases against Hochstein and Anderson, filed separately, were ordered consolidated by the trial court on September 12, 1977. We have frequently held that the ruling of a trial court upon a motion for consolidation of prosecutions properly joinable will not be disturbed in the absence of an abuse of discretion. *State v. Bazer*, 189 Neb. 711, 204 N.W.2d 799 (1973). The same rule applies with regard to a motion to sever. See *State v. Cook*, 182 Neb. 684, 157 N.W.2d 151 (1968). Furthermore, we have held that it is the duty of one challenging a joint trial to demonstrate how and in what manner he was prejudiced. See Neb. Rev. Stat. § 29-2002(4) (Reissue 1979) and *State v. Rice*, 188 Neb. 728, 199 N.W.2d 480 (1972). Hochstein made no such showing at the time of the oral motion and an examination of the record fails to disclose any such prejudice. We find no evidence that the trial court abused its discretion in granting the State's motion for consolidation and denying Hochstein's motion to sever. The assignment of error is overruled.

Appellants next contend that the trial court erred in not granting appellants' request for a mistrial based upon the prosecution's "death qualifying" the jury panel. Unfortunately, the examination of the jury panel was not recorded. However, the court reconstructed what took place immediately after the incident in question during an in camera discussion. It appears that the jury panel was advised that the death penalty was a possible sentence which could be imposed for the crimes charged in the instant cases. Thereafter, a panel member was asked if she believed in the death penalty. She replied that she did not and further advised that her view opposing the death penalty might color her judgment in reaching a verdict of guilty or not guilty. The court proceeded then to further question the panel member and determined that her feelings about the death penalty would, indeed, influence her determination of the factual

question of guilt or innocence. She was, therefore, excused from the panel. Appellants argue that this exclusion amounted to "death qualifying" the jury, contrary to the mandate of the United States Supreme Court in the case of *Witherspoon v. Illinois*, 391 U.S. 510 (1968). We believe, however, that appellants have misconstrued the holding in *Witherspoon.* The *Witherspoon* case held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty . . . ." *Id.* at 522. In so holding, however, the Court, in *Witherspoon,* specifically stated that the issue decided did not concern the exclusion of prospective jurors who stated that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. The exclusion of the panel member in the instant case was not based upon the panel member's refusal to impose the death penalty, but upon her admission that, because she objected to the death penalty, she could not fairly and impartially determine the guilt or innocence of the appellants, even though she would not be called upon to impose the sentence. In *State v. Kirby*, 185 Neb. 240, 175 N.W.2d 87 (1970), we held that one who cannot subordinate his personal views to what he perceives to be his duty to abide by his oath as a juror and to obey the laws of the state must be excused for cause. The trial court correctly perceived that to be the case and properly excused the juror. Such assignment of error must be overruled.

Appellants next contend that the trial court erred in overruling their motion for mistrial after Reams mentioned the word "polygraph" during redirect examination. Counsel for both Anderson and Hochstein immediately objected and, during an in camera hearing, moved for a mistrial on the basis that the witness Reams had mentioned the word "polygraph" in the presence of the jury. The testimony did not indicate whether Reams had ever taken a polygraph test or, if so, what results were obtained.

The trial court overruled the motion for mistrial but, before proceeding further with the trial, instructed the jury, in part, as follows: "The jury is instructed to pay no attention to either the question or the answer as the matters made reference to have no place in a court of law. There is no factual matter at all in this case in any regard to the subject of polygraph. There will be no further reference to that subject in the trial." While it is true that the results of a polygraph test are not admissible in evidence, *State v. Temple*, 192 Neb. 442, 222 N.W.2d 356 (1974), in the instant case, there was no testimony concerning the results of a polygraph test. The mere mention of the word "polygraph," absent more, does not constitute prejudicial error. Appellants have failed to disclose how or in what manner the use of the word "polygraph" was prejudicial under the circumstances and we are unable to see how the appellants could have been prejudiced by the mention of the word "polygraph." The assigned error must be overruled.

Anderson and Hochstein next maintain that the trial court erred in failing to grant their request for a mistrial based upon the State's alleged improper highlighting of appellants' failure to testify. Both appellants maintain that the State made certain remarks during the voir dire examination which, when taken together with a later newspaper article, denied to the appellants a fair trial. The record discloses, however, that neither appellant objected to remarks made by the prosecution at the time they were made, nor did either defendant move for a mistrial based upon those remarks. We have frequently held that a party may not raise alleged misconduct of adverse counsel on appeal where, despite knowledge of the alleged misconduct, the party claiming the misconduct failed to request a mistrial and instead agreed to take the chances of a favorable verdict. *Vacanti v. Montes*, 180 Neb. 232, 142 N.W.2d 318 (1966). In addition, however, an examination of the alleged statements fails to disclose how or in what manner they were prejudicial or improper. With regard to the matter of the

newspaper article, likewise, the claim is without merit. An article which appeared in the Omaha World Herald the morning before the case was submitted to the jury for its consideration read, in part, as follows: "By pleading innocent, Hochstein and Anderson have denied involvement in the crime, but their failure to testify meant jurors never heard either deny the charges." Appellants' claim in this regard fails on at least two grounds. In the first instance, there is no evidence in the record to indicate that the jury failed to follow the admonition given by the trial court not to read newspaper accounts and, in fact, read the article, but, more importantly, there is nothing in the statement itself which could, in any manner, be said to have prejudiced the appellants. The article recited the truth simply and factually. There is no evidence of prejudice. The assignment is overruled.

Hochstein and Anderson next maintain the trial court committed error in failing, on the court's own motion, to change the venue of the trial and to order the jury sequestered during trial. The record discloses that appellants requested neither action from the court. As with the earlier errors assigned, appellants have failed to disclose how or in what manner they were prejudiced by reason of the trial court's failure to change the location of the trial or sequester the jury on its own motion. We have previously held that a motion for change of venue or to sequester the jury is directed to the sound discretion of the trial court and, in the absence of an abuse of discretion, its ruling will not be disturbed on appeal. *State v. Simpson*, 200 Neb. 823, 265 N.W.2d 681 (1978); *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979). There is no evidence that the failure of the court to act on its own motion, if such a duty even existed, was an abuse of discretion. The assignment of error must be overruled.

Anderson and Hochstein next contend that the trial court failed to assure them the right to a fair trial because two pretrial hearings were held in their absence. The first hearing concerned a motion by Anderson to

dismiss. While the record shows that Anderson was not present at this hearing, he was represented by counsel. Further, the record reveals no request by Anderson's counsel that Anderson be present or any objection to proceeding without Anderson's being present. With regard to the second hearing, it appears it was upon a motion made by Anderson's counsel as to whether an evidentiary hearing should be held to consider the admissibility of allegedly tainted evidence. At neither of these hearings was evidence adduced. They were held simply to give Anderson's and Hochstein's attorneys an opportunity to argue the law to the court. The general rule is that an accused has the right to be present at all stages of the trial when his absence might frustrate the fairness of the proceedings. *State v. Bear Runner*, 198 Neb. 368, 252 N.W.2d 638 (1977); *Faretta v. California*, 422 U.S. 806 (1975). We fail to see how Anderson's or Hochstein's absence at a time when their attorneys were arguing matters of law to the court could frustrate the fairness of the proceedings. Likewise, neither appellant is able to point out to us how his absence frustrated the fairness of the proceedings. We have earlier held that a defendant has no constitutional right to be present at the hearing on a motion for a new trial. *State v. Wells*, 197 Neb. 584, 249 N.W.2d 904 (1977). We fail to see how the appellants' absence from these two hearings should be treated any differently. The assignment of error must be overruled.

Appellants' next assignment of error is that the trial court erred in failing to give appellants' requested instruction concerning "reasonable doubt." The record reflects that the trial court, over objection by appellants, instructed the jury on "reasonable doubt" by following the pattern jury instruction NJI 14.08. Appellants maintain that the instruction as approved in NJI is confusing, contradictory, and a misstatement of the traditional understanding of "reasonable doubt." Our examination of the instruction fails to reveal that it does not properly reflect the rule in Nebraska concerning

reasonable doubt. The NJI on "reasonable doubt" has been frequently approved by this court. *State v. Rice, supra; Haswell v. State,* 167 Neb. 169, 92 N.W.2d 161 (1958). Moreover, when all of the instructions given by the court are taken together, they are not, in any manner, misleading and they adequately cover the issues raised. There is, therefore, no prejudicial error. *State v. Bear Runner, supra; State v. Pratt,* 197 Neb. 390, 249 N.W.2d 500 (1977).

Appellants further assign as error the manner in which the State appealed the trial court's suppression of certain of the evidence prior to trial. In essence, appellants argue that it was error to permit the interlocutory appeal to be heard by a single judge as provided for in § 29-824 and that, instead, the appeal was required, under the law, to be heard by the entire court sitting en banc. Section 29-824 specifically provides, in part, as follows: *"In addition to any other right to appeal,* the state shall have the right to appeal from an order granting a motion ... to suppress evidence in the manner herein provided." (Emphasis supplied.) The manner provided for in the quoted section is review by a single judge of the Nebraska Supreme Court at chambers. The appellants maintain that, under the provisions of Neb. Rev. Stat. § 86-705(12) (Reissue 1976), the State was required to appeal to the entire court and we should now remand the matter for a full court hearing. There are, however, several defects in that argument. In the first place, we have now reviewed the entire matter while sitting en banc. No purpose could be served in ordering a new trial so that the State could again appeal to this court en banc. We have disposed of the entire matter at this time. Furthermore, § 86-705(12) reads, in part, as follows: *"In addition to any other right to appeal,* the Attorney General ... shall have the right to appeal from an order granting a motion to suppress made under subsection (11) of this section ...."* (Emphasis supplied.) Section 86-705(12) makes it clear that the right to appeal at the specific time is not exclusive, but is in addition to any

other right of appeal. Section 29-824 and related applicable sections leave no question that they are all a part of "search and seizure" and quite clearly authorize the State to appeal to a single judge of the Nebraska Supreme Court prior to trial in order to permit the question of the suppression of evidence to be tested quickly before trial. The entire court is afforded a subsequent opportunity to review the issue when the appeal on the merits is brought to the entire court. There is nothing vague or unclear about such a procedure.

No procedure for the manner of appeal is prescribed in § 86-705(12). We see little reason why an interlocutory appeal concerning the suppression of evidence should be heard by a single judge of this court sitting at chambers if brought pursuant to § 29-824, but by the entire court sitting en banc if brought under the provisions of § 86-205(12). We, therefore, hold that the procedure for appealing from the provisions of either § 29-824 or § 86-705(12) shall be in accordance with § 29-824 and such appeal shall be heard by a single judge sitting at chambers, provided, however, that upon ultimate appeal to the Nebraska Supreme Court, the defendant may again challenge the correctness of the order by a single judge of the Supreme Court by preserving the question in the motion for new trial as prescribed in § 29-824. We, therefore, overrule the appellants' assignment of error in that regard.

Appellants' last claim goes to the imposition of the death penalty and is presented to us in several parts, some of which have already been answered by this court. The first claim is that the Nebraska death penalty constitutes cruel and unusual punishment, violating the eighth and fourteenth amendments to the United States Constitution and Neb. Const. art. 1, § 9. We may dispose of that claim based upon several recent decisions by both this court and the Supreme Court of the United States. Each has held that the death penalty, when properly imposed by a state, does not violate either the eighth or fourteenth amendment of the United States Constitu-

tion or Neb. Const. art. 1, § 9. See, *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977); *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977); *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977); *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979); *State v. Otey*, 205 Neb. 90, 287 N.W.2d 36 (1979); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

Appellants further maintain that the Nebraska death penalty, imposed by the court rather than a jury, violates the sixth and fourteenth amendments of the United States Constitution and Neb. Const. art. 1, § 11, in that it denies the accused the right to trial by jury and the right to confront his accuser. As we noted in *State v. Simants*, 197 Neb. 549, 558, 250 N.W.2d 881, 887 (1977): "The United States Supreme Court, in Proffitt v. Florida, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), has held that jury sentencing in a capital case is not constitutionally required."

Likewise, the United States Supreme Court, in *Gregg v. Georgia, supra*, addressed the question of evidentiary formalism under the bifurcated system of capital sentencing. It is clear from the *Gregg* decision that the sentencing phase of the process is separate and apart from the trial phase and the traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence. We are unable to find any requirement in the law that a sentencing court may consider only information adduced at trial when exercising discretion in imposing sentence. Likewise, we find no constitutional requirement to permit one convicted the right to confront all who might give information to be used by the sentencing court. Such a requirement goes far beyond any constitutional mandate.

Appellants further maintain that the Nebraska death penalty statutes constitute cruel and unusual punishment because the standards for establishing aggravat-

ing and mitigating circumstances are vague and indefinite.

While one may argue that whenever guidelines are established for a court to use in making decisions, the standards will be in general terms, it appears that the United States Supreme Court, in the *Gregg* case, has approved such guidelines saying, "While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary." *Id.* at 193-95. We have previously approved the standards set out in our. statute on aggravating and mitigating standards. See *State v. Rust, supra.*

Appellants next maintain that the statutes authorizing the imposition of the death penalty in a case of this nature, violate the eighth and fourteenth amendments of the United States Constitution and Neb. Const. art. 1, § 9, because they limit the mitigating factors which may be considered by the sentencing body. We have already and recently disposed of that argument in *State v. Holtan, supra,* when we held that our statute prescribing consideration of aggravating and mitigating circumstances was to be interpreted so as to permit consideration by the court of all aggravating and mitigating circumstances and not just those set forth in the statute, saying specifically: "To the extent that there may be any question we now hold that the trial court shall, in addition to considering the aggravating and mitigating circumstances set forth in section 29-2523, R. R. S. 1943, likewise consider any matter relevant to the imposition of the sentence and receive any such evidence which the court deems to have probative value as to the character of the defendant and shall consider them as a mitigating factor though not specifically a mitigating *circumstance* as set forth in section 29-2523." *Id.* at 318-19, 287 N.W.2d at 674 (emphasis in original).

Lastly, appellants maintain that the death penalty was improperly imposed in this case because of a

misapplication of the aggravating and mitigating circumstances. To the contrary, when this case is compared to the other 32 cases noted by this court in *State v. Williams, supra,* and examined in light of Neb. Rev. Stat. § 29-2523 (Reissue 1979), it clearly speaks in favor of imposing the death penalty. While the author of this opinion has heretofore disagreed with imposing the death penalty in certain of the cases reviewed by this court, finding that they were not sufficiently different from those cases in which the death penalty had not been imposed, the author has no such difficulty in this case. The appellants' absolute and total disregard for the value of human life as displayed by the evidence in this case makes it separate and different from any other case previously considered by this court. Both Anderson and Hochstein, though they had ample time in which to "cool down" and reflect upon what they were planning to do, proceeded without the slightest regard for the fact that they were taking a human life. Hochstein's willingness to kill another for $1,500 displays how little he valued another's life. The evidence in this case of the careful, deliberate premeditation and malice aforethought makes this type of crime exactly the type contemplated by the "aggravating and mitigating circumstances" standards of our statutes.

For Hochstein and Anderson, the killing of Abboud was a business transaction and a most aggravating circumstance within the meaning of § 29-2523. The death penalty for them is an occupational hazard. If ever a situation exists in which the imposition of a death penalty is appropriate, it is clearly in the case of "killers for hire." A careful review of the entire record in light of both § 29-2523 and the previous decisions of this court discloses that there are no mitigating factors in this case which would justify not imposing the most severe penalty for the most heinous crime — the absolute and willful killing of a human for money. We believe the imposition of the death penalty in this case is amply justified. Having, therefore, found no errors requiring a

new trial, we affirm the conviction and the sentence of death imposed.

AFFIRMED.

CLINTON and HASTINGS, JJ., not participating.